635 A.2d 43

Joseph J. WIELEPSKI

v.

HARFORD COUNTY, Maryland.

No. 617, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Jan. 5, 1994.

William R. Phelan, Jr. (Alfred Neil Kramer, on the brief), Aberdeen, for appellant.

Nancy L. Giorno, Asst. County Atty. (Diane T. Swint, Assistant County Atty., on the brief), Bel Air, for appellee.

Argued before BISHOP, WENNER and CATHELL, JJ.

BISHOP, Judge.

Pursuant to Rule 2.4 of the Harford County Administrative Rules of Procedure for Regulations and Hearings, appellants, Joseph J. Wielepski and Mr. and Mrs. Stanley Wielepski (collectively, "the Wielepskis"), filed an appeal to the Circuit Court for Harford County from a final decision of the Harford

County Director of Administration (the "Director") requiring the Wielepskis to pay a road improvement fee as a condition to the development of real estate. Appellee, Harford County (the "County"), filed a motion to dismiss the appeal, which the circuit court denied. After the court heard oral argument, it affirmed the decision of the Director. The Wielepskis filed a timely notice of appeal to this Court.

## *Issue*

The Wielepskis raise one question for our consideration: Does § 4.051 of the Harford County Subdivision Regulations impose an illegal tax? We shall answer that question in the affirmative and, accordingly, reverse the judgment of the circuit court.

## *Facts*

The facts of this case are undisputed. The Wielepskis, owners of real property in Harford County, sought to develop that property by subdividing it into nine individual home lots. In the course of dealings with the County to gain all necessary approvals, the Wielepskis learned that they would be required to pay the County approximately $97,000 for future road improvements to two public roads bordering their property. That estimate was based on the anticipated cost of improving the roads to meet County standards. This charge would add $10,000 to $12,000 to the price of each lot, thereby driving the cost of the lots above market value.

Over a year after learning of the estimated charge, the Wielepskis signed a Preliminary Plan Approval letter that included, next to their signatures, the following statement: "I hereby accept the conditions of this preliminary plan approval." Paragraph three of that letter contained the following language: "Road frontage improvements will be required along Robinson Mill Road and Day Road."

The County imposed the road improvement charge pursuant to § 4.051 of its Subdivision Regulations, which provides in pertinent part:

c. Frontage improvements.

1. Proposed developments, including residential, business, industrial or institutional developments or subdivisions to be constructed along existing County roadways not meeting County road standards for existing or contemplated traffic demands will be required to improve one half (½) of the County roadway along their property to required County road standards. Should construction of the roadway be considered infeasible at the time of development, the developer may deposit the estimated construction cost in an account with Harford County for the future improvements of that roadway to the designated County road standards.

2. Frontage improvements are required when a parcel of land is subdivided or developed for purposes of creating:

\*        \*        \*        \*        \*        \*

(b) any residential use for more than five (5) dwelling units. . . .

Because construction of the roadway was deemed to be "infeasible" at the time of development, the Wielepskis were required to deposit the fee into an escrow account pursuant to § 4.051(e)(3), which provides:

Upon the written request of the subdivider/developer, in lieu of completing the improvements required, and upon mutual recommendation by the Department of Public Works and Department of Planning and Zoning and approval by the Department of Law, the subdivider/developer shall deposit the cost, as estimated by Harford County of constructing/installing any and all improvements required in an interest-bearing escrow account with Harford County, thereby insuring the actual construction/installation of such improvements. Such an account may be permitted to be established when:

(a) The construction of the road improvement is considered by the Department of Public Works to be infeasible at the time because of existing physical or topographical conditions, or the developer/County is unable to acquire the necessary rights-of-way; or

(b) The County has a proposed capital project set forth in the Capital Improvements Program.

At the hearing before the Director, there was a discussion regarding to what use the funds would be applied. The Wielepskis maintained that the funds would not be used to improve the roadways, but would be used to maintain them. Arden Holdredge, Chief of Current Planning, said that "the money is put in escrow, but it would have to be used on these two roads. For example to improve an intersection impacted by this development, drainage, etc." The Director said that "the money would be used to perform any maintenance required or make any improvements needed as a result [of] this subdivision—it would not be used for snow removal, etc." The County, through counsel, explained that the funds "would be used for anything that effects [sic] this road because of this subdivision." The County also acknowledged that, were the County actually to make the road improvements, there is no question that people other than the subdivision's residents would benefit from those improvements. In his decision letter, the Director concluded that, "[w]here traffic volume does not immediately warrant major widening or reconstruction, funds collected for road improvements may be used to do maintenance and repair work in the years to come."

The circuit court affirmed the Director's decision in a letter opinion, which reads:

The Court will make the analysis of this case relatively simple as we believe that the County's Memorandum correctly analyzes the matter, including that the monies to be paid in this case are not an unlawful tax. Accordingly, the decision of the Director of Administration must be **AFFIRMED**.

We can see a practical problem that may present in this and like situations. You may have a case where a significant amount of money is deposited for future road improvement where the road may never be improved. This will leave a considerable amount of money in limbo on a potentially indefinite basis. In that connection, the County may

wish to amend the law and/or regulations to allow for some refund after a fixed period of time if the road is not improved.

## *Discussion*

### I

"As subdivisions of the State, counties may only act when specific grants of power are conferred upon them. They do not have the power to tax on their own authority, but may do so only if the power has been granted by the State." *Eastern Diversified Properties, Inc. v. Montgomery County,* 319 Md. 45, 49, 570 A.2d 850 (1990) (citations omitted); see also Md. Const. art. XI–A, § 2.

As a charter county exercising home rule powers, Harford County is governed by the Express Powers Act, Md.Ann.Code art. 25A, §§ 1–6 (1990 & Supp.1993). Section 5(O) of that act expressly grants Harford County the power to levy a property tax, but it does not grant a general taxing power. *See Eastern Diversified,* 319 Md. at 50, 570 A.2d 850; *Montgomery County Bd. of Realtors, Inc. v. Montgomery County,* 287 Md. 101, 106–07, 411 A.2d 97 (1980). Under § 5(S), however, Harford County may

pass all ordinances ... not inconsistent with the provisions of [Article 25A] or the laws of [Maryland], as may be proper in executing and enforcing any of the powers enumerated in [§ 5] or elsewhere in [Article 25A], as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.

The Court of Appeals has

characterized § 5(S) "as a broad grant of power to legislate on matters not specifically enumerated in Art. 25A," in pursuance of which necessary and beneficial ordinances may be enacted consonant with the general powers of the charter county; moreover, [the Court of Appeals has] recognized that § 5(S) must be liberally construed to afford wide discretion to charter counties in the good faith exercise of their police powers in the public interest.

*Eastern Diversified,* 319 Md. at 50–51, 570 A.2d 850 (*quoting Montgomery Citizens League v. Greenhalgh,* 253 Md. 151, 161, 252 A.2d 242 (1969)). Thus, we must determine whether the road improvement fee in the case *sub judice* is an illegal tax, or a reasonable fee incidental to a valid regulation enacted pursuant to Harford County's police power.

In *Maryland Theatrical Corp. v. Brennan,* 180 Md. 377, 381–82, 24 A.2d 911 (1942), the Court of Appeals distinguished the characteristics of revenue measures from those of regulatory measures.

A regulatory measure may produce revenue, but in such a case the amount must be reasonable and have some definite relation to the purpose of the Act. A revenue measure, on the other hand, may also provide for regulation, but if the raising of revenue is the primary purpose, the amount of the tax is not reviewable by the courts. There is no set rule by which it can be determined in which category a particular Act primarily belongs. In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure. "In general, * * * where the fee is imposed for the purpose of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power; but where it is exacted solely for revenue purposes and its payment give[s] the right to carry on the business without any further conditions, it is a tax."

(*Quoting* 33 Am.Jur. *Licenses* ¶ 19, at 340). The Wielepskis argue that, rather than imposing a regulatory fee, § 4.051 imposes a tax—similar to the "development impact fee" the Court of Appeals recently struck down in *Eastern Diversified, supra*—aimed primarily at raising revenue in order to fund road improvements. We agree.

In *Eastern Diversified,* a property owner (Diversified) applied for a building permit to construct an automobile sales and service facility. Montgomery County approved the per-

mit upon the condition that Diversified pay a development impact fee of $118,006. Development impact fees are "charges levied by local governments against new development to generate revenue for capital funding necessitated by that development." *Price Dev. Co. v. Redevelopment Agency*, 852 F.2d 1123, 1127 (9th Cir.1988) (*citing* Juergensmeyer & Blake, *Impact Fees: An Answer to Local Governments' Capital Funding Dilemma*, 9 Fla.St.U.L.Rev. 415, 417 (1981)).

Montgomery County assessed development impact fees on building permit applicants in two designated "policy planning areas," Germantown and eastern Montgomery County.

> In enacting the development impact fee, the County stated that it was "exercising its home rule powers, including its police power to ensure and coordinate the provisions of adequate transportation facilities with new development so that the public health, safety, and welfare are enhanced, traffic congestion is lessened, accessibility is improved, and economic development is promoted."

*Eastern Diversified*, 319 Md. at 49, 570 A.2d 850 (*quoting* Montgomery County Code ch. 49A, § 3(b) (1984)). The fees were "calculated based upon the type of structure to be built and, in certain instances, upon the total square footage of the structure." *Id.* at 48, 570 A.2d 850. The revenue generated from the fees was to be used to finance road construction in the growth areas.

The Court of Appeals held that the fee was an illegal tax because it was "exacted solely for revenue purposes, is an involuntary payment of money, and the funds raised by the fee are used to finance road construction which benefit the general public." *Id.* at 55, 570 A.2d 850. The Court relied on several factors in reaching this conclusion:

> Indeed, the revenue raising objective of the development impact fee scheme is evident in § 49A–2(f) which states:
>
>> "Imposing a development impact fee that requires new development in certain impact fee areas to pay their pro rata share of the costs of impact highway improvements necessitated by such new development in conjunction with

other public funds is a reasonable method of raising the funds to build such improvements in a timely manner." Section 49A–2(g) states that funds collected from the imposition of development impact fees "will fund, in part, the improvements necessary to increase the transportation system capacity in the impact fee areas thereby allowing development to proceed." Nothing in ch. 49A suggests that impact fees are charged solely on the basis of service provided to the property owner, or to defray expenses of the development regulatory process. As we see it, the primary and predominant purpose of the enactment of the development impact fee is to raise revenue, regardless of what incidental regulatory effect the imposition of the fees may have on development within the county. The amount of the individual development impact fee in this case ($118.006) [sic], the projected total revenue of $108,723,000 from impact fees and the anticipated expenditure of $227,483,000 on highway construction indicate to us that the main purpose of ch. 49A is to raise revenue.

Additionally, there are no further conditions that must be met by the developer when the impact fee is assessed. All that is required under ch. 49A–4 for the developer to qualify for a building permit is the payment of the impact fee. The County's principal purpose under ch. 49A is not the regulation of development, therefore, but rather to generate revenue to build roads. The relationship between the fee and the benefit to the property owner necessary for the measure to be regulatory in effect is not just that the property owner receive some benefit from the improvement, as the County asserts, but as we said in *Theatrical Corp. ...*, "[t]he amount must be reasonable and have some definite relation to the purpose of the Act."

*Id.* at 54–55, 570 A.2d 850.

The County argues that § 4.051(c) has two features that distinguish it from the development impact fee in *Eastern Diversified.* First, the County's fee pertains only to road improvements directly fronting the property to be developed. Thus, the improvements directly benefit the specific property

involved in the development project, unlike the case in *Eastern Diversified,* where the fees supported road construction in a larger, non-specific, policy planning area. Second, there is a specific nexus between the amount of the fee and the actual cost to improve the one-half of the roadway fronting the property to County road standards. The fee is based on the County's estimation of the *actual* cost of road improvements. In *Eastern Diversified,* on the other hand, the fee was based on the type or size of structure to be built and bore no relation to the actual cost of road improvements.

In light of *Maryland Theatrical Corp.* and *Eastern Diversified,* we hold that the Harford County Council was without authority to enact § 4.051(c) of the County's Subdivision Regulations because it exacts an illegal tax. The County's attempt to distinguish the nature of the fee from Montgomery County's development impact fee is unavailing. The sole purpose of the fee in the case *sub judice* is to generate revenue to finance, in whole, road improvements necessary as a consequence of land development. Nothing in § 4.051 suggests that the fee is charged solely on the basis of service provided to the property owner. Indeed, the County acknowledged that the road improvements would benefit those other than the property owners; we shall take judicial notice of the fact that improvements to public roads benefit the public in general, not only the bordering property owners. Further, there is absolutely no indication that the fee is used to defray expenses of the development regulatory process. In fact, there is every reason to believe that the fee is not used to finance the regulatory process because the revenue generated from the fee is to be applied, theoretically, toward the *actual* cost of the road improvements.

In *Montgomery County v. Waters Landing Ltd. Partnership,* 99 Md.App. 1, 635 A.2d 48 (1994), we revisited the Montgomery County "impact fee" and determined that, by virtue of 1963 Md.Laws ch. 808, Montgomery County did and does have the authority to impose that fee, which is in actuality an excise tax. *Id.* at 12–13, 635 A.2d at 54. We recognized that, following *Eastern Diversified,* the Maryland

General Assembly enacted 1990 Md.Laws ch. 707 " '[for] the purpose of *clarifying* and *confirming* the authority of Montgomery County to impose and provide for the collection of development impact taxes....' " *Id.* at 11, 635 A.2d at 53. Further, we pointed out that statutes similar to ch. 808 also exist with reference to Baltimore County and Baltimore City. *Id.* at 32 n. 6, 635 A.2d at 64.

Based on *Waters Landing,* we conclude that, had the Maryland General Assembly intended to vest Harford County with the authority to impose an impact tax, it would have enacted legislation similar to ch. 808. In the absence of such special legislation, we must conclude that the County does not have the power to levy the fee. Because we conclude that § 4.051(c) is facially invalid, it is not necessary to address the Wielepskis' contention that § 4.051(c), as applied under the particular facts of this case, is illegal.

## II

■ The County advances, as an independent basis for affirming the judgment of the circuit court, the argument that the Wielepskis are somehow precluded from challenging the validity of the fee because they are contractually obligated to pay the fee by virtue of the preliminary plan approval letter bearing their signatures and agreement to abide by the terms thereof, including improvement of the road frontage along Robinson Mill and Day Roads. We disagree.

The County does not cite any authority to support the proposition that a property owner can obligate itself, by contract, to pay an illegal tax, nor do we perceive this to be the law of Maryland. Assuming, without deciding, that the preliminary plan approval letter was sufficiently definite to constitute a contract between the County and the Wielepskis for the payment of fees necessary to complete the road improvements, based on our discussion in Section I, *supra,* we hold that the provision for completion of the road improvements was illegal, against public policy, and therefore, unen-

732

forceable. *See State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631, 643, 516 A.2d 586 (1986) ("A contractual provision that violates public policy is invalid, but only to the extent of the conflict between the stated public policy and the contractual provision."); *Van Meter v. Wilkinson,* 187 Md. 492, 499, 50 A.2d 557 (1947) (where the consideration for a promise is illegal, contract will not be enforced).

**JUDGMENT REVERSED; APPELLEE TO PAY THE COSTS.**