COUNTRY JOE, INC., et
al., Respondents,

v.

CITY OF EAGAN, petitioner, Appellant.

No. C8–95–2289.

Supreme Court of Minnesota.

March 6, 1997.

Greene & Espel, P.L.L.P., Clifford M. Greene, John M. Baker, Minneapolis, Sheldon, Sheldon, Dougherty & Molenda, James F. Sheldon, Michael G. Dougherty, Apple Valley, for Appellant.

Thomas H. Goodman, Gerald S. Duffy, Wood R. Foster, Jr., Anthony J. Gleekel, Siegel, Brill, Greupner & Duffy, P.A., Minneapolis, for Respondents.

Campbell, Knutson, Scott & Fuchs, P.A., Roger N. Knutson, Eagan, amicus curiae.

## OPINION

KEITH, Chief Justice.

This case requires us to decide whether the City of Eagan may lawfully impose a road unit connection charge as a condition of issuance of all building permits within its borders. The city adopted such a charge in 1978 for the purpose of funding major street improvements. The respondents, home building contractors, challenged the city's authority to impose such a charge and sought a refund of all charges collected within the six-year statute of limitations. They also sought class certification on behalf of themselves and all others subjected to the charge. On cross-motions for summary judgment, the parties entered into a stipulation calling for the district court to initially consider only the question of the city's authority to impose the charge. After a hearing, the district court concluded that the city had the authority under its police powers to impose a road unit connection charge. The court of appeals reversed, concluding that the charge was unauthorized either by statute or case law. *Country Joe, Inc. v. City of Eagan,* 548 N.W.2d 281, 284 (Minn.App.1996). We affirm.

On February 14, 1978, the Eagan city council adopted a resolution imposing a road unit connection charge payable as a condition to issuance of all building permits within the city.[1] The resolution stated that its purpose was to provide "an equitable source of funding for major county and city street construction * * * in order to accommodate new development and traffic generated from future anticipated residential, commercial and industrial construction * * *."

The charge was prompted by a study conducted by the city's consulting engineers in 1977, which projected a shortfall of $1.11 million in funds available to finance major street construction in the city through the year 2000. The consulting engineers proposed that the city make up this shortfall by imposing a road unit connection charge, patterned after the water and sewer connection charges already imposed by the city pursuant to state law. *See* Minn.Stat. § 444.075, subd. 3 (1996).

The city deposits road unit connection charges collected into a Major Street Fund account, along with other sources of road funds.[2] Funds are not earmarked for any particular project and the city does not attempt to link expenditures to any particular funding source. In addition to major street construction costs, miscellaneous charges such as sealcoating and the purchase of signal lights are occasionally paid out of the account.

---

1. The resolution resolved in part:
   3. That the following unit connection charges be required to be paid at the time of acquisition of future building permits in the City:
   a. For single family, double bungalow and townhouse residential building units—$75 per unit.
   b. For multiple family residential units—80% of the normal residential unit connection charge.
   c. For commercial and industrial building permits—amount determined on an acreage basis or portion thereof with three residential units per acre and a minimum of one residential equivalent unit connection charge.

2. The city's Finance Director testified that road unit connection charges collected are commingled with the city's "ad valorem tax levy, some special assessment collections, interest earnings" and other miscellaneous revenue sources in the Major Street Fund.

The original plan recommended that the charge "be reviewed annually and totally revised every 5 years in order to adjust for any significant changes in construction costs, revenue projections or changes in the development pattern within the City of Eagan." In December 1979, the city revised its estimated costs of construction upward to include the addition of pedestrian walkways to the city's street design. As a consequence, the city increased the road unit connection charge for a single family residence from $75 to $185. Except for annual increases based on an inflationary index, the plan has not been updated since this initial revision of 1979. The inflation-adjusted charge for a single family residence had increased from the initial $75 to $410 at the time this lawsuit was filed in 1994.

On appeal, the city contends that the imposition of a road unit connection charge is a lawful exercise of its implied powers under Minnesota law. The city suggests that the authority to finance road improvements can be implied from several sources, including the city's municipal planning authority under Minn.Stat. ch. 462; the implied power to impose an "impact fee" to fund infrastructure improvements, as currently recognized in numerous other states; and the city's power to collect regulatory and license fees pursuant to its general welfare powers under Minn. Stat. § 412.221, subd. 32.

### I.

The city of Eagan is a "statutory city," meaning it is a municipal corporation that has not adopted a home rule charter as provided for under Minnesota law. *See* Minn.Stat. § 410.015. As a limited statutory creation, the city has no inherent powers beyond those "expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred." *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 357, 143 N.W.2d 813, 820 (1966). We first consider the city's contention that the road unit connection charge is a valid exercise of its implied municipal planning authority under Minn.Stat. ch. 462, the Municipal Planning Act. The policy statement introducing the act clearly expresses

the legislature's intent to confer broad planning authority on cities: "It is the purpose of sections 462.351 to 462.364 to provide municipalities, in a single body of law, with the necessary powers and a uniform procedure for adequately conducting and implementing municipal planning." Minn.Stat. § 462.351. The city asserts that the road unit connection charge is merely an example of its lawful exercise of the broad planning authority conferred upon it under the act.

The city relies on our decisions in two municipal planning cases in support of its assertion. In *Naegele Outdoor Adver. Co. v. Village of Minnetonka,* we upheld an ordinance adopted by the village requiring advertisers to phase out billboards located in exclusively residential zones. 281 Minn. 492, 505, 162 N.W.2d 206, 215 (1968). We concluded that while no statute expressly authorized such an ordinance, the power to do so must necessarily be implied to effectuate the village's express statutory authority to create exclusively residential districts. *Id.* at 504, 162 N.W.2d at 215.

In *Almquist v. Town of Marshan,* we upheld the town's adoption of a zoning moratorium against a landowner's contention that, by expressly extending the authority to adopt such a moratorium to county boards while remaining silent on the power of municipalities to adopt similar moratoria, the legislature evinced an intent to withhold the authority from municipalities. 308 Minn. 52, 64, 245 N.W.2d 819, 825 (1976). We rejected the negative inference urged by the landowner, noting that, among other arguments, "an equally persuasive argument may be made that the legislature * * * simply assumed that municipalities had inherent power to enact such ordinances." *Id.* Thus, the city urges that after *Almquist,* absent an explicit expression of a contrary purpose by the legislature, cities are presumptively endowed with broad municipal planning powers—including the power to finance municipal improvements—subject only to the limitations of good faith and nondiscrimination. *Id.* at 65, 245 N.W.2d at 826.

Relying on *Almquist,* the city contends that the court of appeals erred in concluding that the legislature's failure to explicitly au-

thorize the road unit connection charge in the tax statute was an "explicit expression" of its intent to withhold such authority. *Country Joe,* 548 N.W.2d at 284. To the contrary, the city asserts that not only is the construction of roads to meet new development needs reasonably related to the welfare of its citizens, *see* Minn.Stat. § 412.221, subd. 32, but also the implied authority to finance such construction can be derived from the Municipal Planning Act, *see id.* § 462.351, as well as from the city's authority to make public improvements under Minn.Stat. § 429.021, subd. 1 and Minn.Stat. § 412.221, subd. 6.

Finally, the city cites a Virginia case in arguing that the "authority to finance public activity is implicit in [the] authority to undertake it[.]" In *Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach,* the Virginia Supreme Court rejected the contention of an association of contractors that statutory authorization for a $200 million water project alone was insufficient and that "the financing mechanism or fee chosen by the City must be authorized separately * * *." 241 Va. 114, 118, 400 S.E.2d 523, 526 (1991). The court noted,

> In order to exercise the duty and authority to provide a water system then, the corresponding ability to pay for the system must exist. We agree with the trial court that the ability to finance the cost of providing this service is inherent in the authority to provide it, and the specific mechanism chosen by the City to finance the project need not be defined by statute.

*Id.* at 119, 400 S.E.2d at 526.

We agree that *Naegele* and *Almquist* broadly define a city's ability to plan for the use of property within its borders. That the Municipal Planning Act expressly confers broad municipal *planning* powers on cities does not necessarily imply that the legislature similarly intended to confer broad *financing* powers under the act. In fact, the legislature's actions support the opposite conclusion. Although the legislature expressly provided for the sewer and water charges after which the city patterned its road unit

connection charge, *see* Minn.Stat. § 444.075, subd. 3, it failed to provide such authorization for a road charge. That this lack of express statutory authorization was not the result of legislative oversight is evidenced by statutory provisions expressly establishing special assessments as the mechanism by which cities are empowered to finance road improvements. *See* Minn.Stat. §§ 429.021, subd. 1(1), 412.221, subd. 6.

The Virginia court's decision in *Tidewater* is thus readily distinguishable.[3] In *Tidewater,* the court noted that the Virginia legislature provided *no funding mechanism* at all for the water project which it had authorized. 241 Va. at 119, 400 S.E.2d at 526. In contrast, the Minnesota legislature has *specifically provided* a funding mechanism for road improvements; therefore, no funding mechanism need be implied to effectuate the legislative grant of authority to undertake road improvements. *Cf. Naegele,* 281 Minn. at 503–04, 162 N.W.2d at 215 (holding that the power to amortize nonconforming uses must necessarily be implied in face of legislative silence in order to effectuate the village's express power to create residential zones); *Almquist,* 308 Minn. at 63–65, 245 N.W.2d at 825–26 (holding that the power to adopt a zoning moratorium may be implied to effectuate the town's zoning powers despite the legislature's silence on whether cities, as well as counties, possessed such authority). Accordingly, we conclude that the authority to impose a road unit connection charge cannot be implied from the city's municipal planning authority. *See Mangold,* 274 Minn. at 357, 143 N.W.2d at 820.

## II.

█ The city next contends that the court of appeals erred in rejecting case law from other jurisdictions approving of similar charges as "impact fees." Impact fees have been lauded by local governments in recent years as a welcome means to "shift a portion of the cost of providing capital facilities to serve new growth from the general tax base to the new development generating the de-

---

**3.** As an initial matter, *Tidewater* did not involve road impact fees of the type enacted by the City of Eagan, which coincidentally *were specifically* *provided for* under Virginia law. 241 Va. at 118, 400 S.E.2d at 526.

mand for the facilities." Martin L. Leitner & Susan P. Schoettle, *A Survey of State Impact Fee Enabling Legislation,* in *Exactions, Impact Fees and Dedications: Shaping Land–Use Development and Funding Infrastructure in the* Dolan *Era* 60 (Robert H. Freilich & David W. Bushek eds., 1995).

An impact fee has been defined as a form of development exaction that is:

* in the form of a predetermined money payment;

* assessed as a condition to the issuance of a building permit, an occupancy permit or plat approval;

* pursuant to local government powers to regulate new growth and development and provide for adequate public facilities and services;

* levied to fund large-scale, off-site public facilities and services necessary to serve new development;

* in an amount which is proportionate to the need for the public facilities generated by new development.

Brian W. Blaesser & Christine M. Kentopp, *Impact Fees: The "Second Generation,"* in *1991 Zoning and Planning Handbook* 255, 264 (Kenneth H. Young ed., 1991).

Commentators suggest that an impact fee differs from a tax in that an impact fee is levied as "compensation for the services rendered." *Id.* at 266 (citation omitted). Thus, key to the concept of a true impact fee is that the amount assessed a developer must reflect the cost of infrastructure improvements necessitated by the development itself. Conversely, "a charge having no relation to the services rendered, assessed to provide general revenue rather than compensation, is a tax." *Id.* Impact fees have also been distin-

guished from special assessments: "The primary difference is that special assessments represent a measure of the *benefit* of public improvements on new or existing development, whereas impact fees typically measure the *cost* of the demand or need for public facilities as a result of new development only." *Id.* at 267 (emphasis added).

The contractors argue that impact fees are lawful only if such fees are authorized, or appropriately limited, by state enabling legislation. They cite a number of cases from other jurisdictions in support of their contention that it "is well-settled that impact fees, such as the Road Unit Connection Charge, are illegal without specific enabling legislation." [4] They also point to the failure of a bill proposing an impact fee in a recent session as evidence that the Minnesota legislature has not endorsed the concept of impact fees. *See* H.F. 988, 79th Leg. (Minn.1995) (a bill to amend § 462.358 of the Municipal Planning Act to authorize school impact fees).

The city responds by citing a number of decisions from other states that allegedly uphold the imposition of impact fees without express statutory enabling legislation.[5]

We conclude, however, that we need not reach the issue of whether impact fees are authorized in Minnesota in order to pass on the validity of the road unit connection charge imposed by the city. By definition, an impact fee must be "in an amount which is proportionate to the need for the public facilities generated by new development." Blaesser & Kentopp at 264. In this case, however, the city essentially ignored its own consulting engineers' recommendation that the road unit connection charge be periodically updated to account for changes in costs, revenue

---

**4.** *See Aunt Hack Ridge Estates, Inc. v. Planning Comm'n of Danbury,* 160 Conn. 109, 273 A.2d 880 (1970); *Idaho Bldg. Contractors Ass'n v. City of Coeur d'Alene,* 126 Idaho 740, 890 P.2d 326 (1995); *Coronado Dev. Co. v. City of McPherson,* 189 Kan. 174, 368 P.2d 51 (1962); *Eastern Diversified Properties, Inc. v. Montgomery County,* 319 Md. 45, 570 A.2d 850 (1990); *Wielepski v. Harford County,* 98 Md.App. 721, 635 A.2d 43, *vacated on other grounds,* 335 Md. 225, 642 A.2d 1357 (1994); *Middlesex & Boston St. Ry. v. Board of Aldermen,* 371 Mass. 849, 359 N.E.2d 1279 (1977); *New Jersey Builders Ass'n v. Bernards Township,* 108 N.J. 223, 528 A.2d 555 (1987);

*Hillis Homes, Inc. v. Snohomish County,* 97 Wash.2d 804, 650 P.2d 193 (1982).

**5.** *See Associated Home Builders of Greater E. Bay, Inc. v. City of Walnut Creek,* 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606 (1971); *Contractors & Builders Ass'n v. City of Dunedin,* 329 So.2d 314 (Fla.1976); *Holmdel Builders Ass'n v. Township of Holmdel,* 121 N.J. 550, 583 A.2d 277 (1990); *Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach,* 241 Va. 114, 400 S.E.2d 523 (1991).

projections, or patterns of development. Thus, for the period in question, there is insufficient evidence that the charge was proportionate to the need created by the development upon which the burden of payment fell. Accordingly, we reserve the issue of whether impact fees are authorized under Minnesota law, but reject the city's contention that the road unit connection charge draws its authorization as such a fee.

### III.

■ The city's final argument is that the court of appeals erred in concluding that the road unit connection charge is an unlawful tax.[6] The city argues that the charge is not a tax and suggests that the charge is authorized as a regulatory or license fee under its general welfare powers. *See* Minn.Stat. § 412.221, subd. 32.

We have consistently rejected the argument that the general police power extends to permit revenue raising measures by municipalities. When it has been apparent that a city's true motivation was to raise revenue—and not merely to recover the costs of regulation—we have disregarded the fee label attached by a municipality and held that the charge in question was in fact a tax. *See State v. Labo's Direct Serv.,* 232 Minn. 175, 182, 44 N.W.2d 823, 827 (1950) (striking down a fee on gasoline pumps as "a tax for the purpose of producing more revenue for the municipality"); *Barron v. City of Minneapolis,* 212 Minn. 566, 570, 4 N.W.2d 622, 624 (1942) (invalidating a license fee after concluding that "[w]hat the city council sought to accomplish, and did accomplish, was the enactment of a revenue measure").

The contractors assert that the road unit connection charge cannot find validity "under the cloak of the city's police power" for two reasons: first, there is already a separate building permit fee which covers the purely regulatory costs of building permit issuance and enforcement; and second, the plain language of the resolution enacting the charge

indicates that it was enacted "for the purpose of funding oversizing of major streets" as well as to provide "an equitable source of funding" for such development and was, thus, expressly intended to raise revenue. We agree.

We conclude that the charge is a revenue measure, benefiting the public in general, and is not an authorized exercise of the city's police powers. In reaching this conclusion, we find it significant that revenues collected from the road unit connection charge are not earmarked in any way to fund projects necessitated by new development, but instead fund all major street construction, as well as repairs of existing streets. Because it is not a purely regulatory or license fee but instead a revenue measure, the road unit connection charge is a tax which must draw its authorization, if at all, from the city's powers of taxation. *Accord Eastern Diversified,* 319 Md. at 54–55, 570 A.2d at 854–55 (determining that a road improvement impact fee was a tax because "[n]othing * * * suggests that * * * [the] fees are charged solely on the basis of service provided to the property owner, or to defray expenses of the development regulatory process"); *Hillis Homes,* 97 Wash. 2d at 808, 650 P.2d at 194–95 (holding that park assessments, "although characterized by the Counties as fees * * * are taxes, rather than fees" because the ordinances were designed to raise revenue); *Idaho Bldg. Contractors,* 126 Idaho at 743, 890 P.2d at 329 (concluding that development impact fee not limited geographically or to improvements to be used solely by those creating the new development was a tax and not a fee); *Wielepski,* 98 Md.App. at 730, 635 A.2d at 47–48 (taking judicial notice of the fact that "improvements to public roads benefit the public in general, not only the bordering property owners" in concluding that fee was an illegal tax).

■ The taxing authority afforded municipalities under state law is delineated in Minn.Stat. § 412.251. Although Minn.Stat.

<hr/>

**6.** The court of appeals did not expressly state that the basis of its opinion was that the charge was an unlawful tax. However, the court did state, "A decision of this court upholding a road unit connection charge would, we believe, direct-

ly contravene the intent of the legislature in providing specific limitations on the *power to tax." Country Joe,* 548 N.W.2d at 286 (emphasis added).

§ 412.251 specifies that municipalities are authorized to levy taxes for such far-reaching purposes as "provid[ing] musical entertainment to the public," "for band purposes," and "for the support of a municipal forest," we conclude there is nothing in the statute suggesting the authority to impose anything similar to a road unit connection charge. *See* Minn.Stat. § 412.251. Although paragraph 11 of Minn.Stat. § 412.251 operates as a catch-all provision, recognizing a city's authority to impose "other special taxes authorized by law," we conclude on the basis of our preceding analysis that the road unit connection charge is not so "authorized by law." Minn.Stat. § 412.251(11). Accordingly, we conclude that the road unit connection charge cannot find validity under the city's power of taxation.[7]

AFFIRMED.

---

**7.** Because we conclude that the road unit connection charge is unauthorized under Minnesota law, we need not reach the contractor's argument that the charge is an unconstitutional taking without just compensation. The amicus curiae raises the additional argument that, based on the court of appeals decision in *Crystal Green v. City of Crystal*, the contractors waived their right to challenge the road unit connection charge by failing to challenge the charge at an earlier date. *See* 421 N.W.2d 393 (Minn.App.1988), *pet. for rev. denied* (Minn. May 25, 1988). However, because this issue was neither reached by the district court nor raised by a party before this court, we likewise decline to address it on review. *See Thayer v. American Fin. Advisers, Inc.,* 322 N.W.2d 599, 604 (Minn.1982) (declining to consider an issue not "considered by the trial court in deciding the matter before it"); *State v. Applebaums Mkts., Inc.,* 259 Minn. 209, 216, 106 N.W.2d 896, 901 (1960) (holding that amicus curiae may not raise the issue of the constitutionality of a statute when the issue was not raised by any party to the action).