*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0762**

CLino LLC, et al.,
Appellants,

vs.

City of Lino Lakes,
Respondent.

**Filed March 28, 2016
Affirmed
Reilly, Judge**

Anoka County District Court
File No. 02-CV-11-7763

Daniel J. Beeson, Jay P. Karlovich, Darcy M. Erickson, LeVander, Gillen & Miller, P.A., South St. Paul, Minnesota (for appellants)

Joseph J. Langel, Christian R. Shafer, Ratwik, Roszak & Maloney, P.A., Minneapolis, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Connolly, Judge; and Reilly, Judge.

## UNPUBLISHED OPINION

**REILLY**, Judge

In this special assessment appeal, appellant-landowners argue that a special assessment levied by respondent city (1) was not authorized under Minnesota Statute Chapter 429; (2) violated their constitutional rights to equal protection and due process of

law; (3) operated as an illegal traffic impact fee; and (4) imposed a cost that exceeded the benefit of the improvements received. We affirm.

**FACTS**

The present dispute arises out of a fee assessment imposed by the City of Lino Lakes (the city) against property-owners for improvements to the Interstate 35E (I-35E) and County State Aid Highway 14 (CSAH 14) interchange in Anoka County, Minnesota. ALino, LLC, BLino, LLC, and CLino, LLC (appellants) own property in the northwest, northeast, and southeast quadrants of the interchange.

In 2004, the city conducted an alternative urban area-wide review (AUAR) to assess infrastructure improvements and the approximate cost of improvements. The AUAR recommended reconstructing the CSAH14/I-35E interchange to provide for additional traffic capacity, including adding traffic lanes and expanding capacity on the highway ramps. The city's community development director testified that the city's inadequate infrastructure and inability to accommodate traffic were holding up future development in the area. In 2009, the city council retained engineering firm SRF Consulting (SRF) to perform a feasibility study and draft a preliminary improvement plan for the interchange. The city sought to determine "what type of infrastructure improvements may be necessary if development occurred and what the approximate cost of those improvements would be." The city held two preliminary meetings with local property-owners, including appellants, to share information about the process. The city informed property-owners that there would be a public hearing to discuss the process and methodology.

2

The city and SRF discussed "hundreds" of different variations of possible assessments during the feasibility-study process. Costs were allocated based on future land use projections from the comprehensive plan and generalized into four categories: commercial, industrial, land-use, and institutional. Initially, SRF assessed the parcels of land based on aerial photography of the properties, which identified the gross area for each parcel minus wetlands and other nondevelopable portions of land, to find the "net developable area." The feasibility study proposed a "total reconstruction" of the existing interchange into a partial cloverleaf configuration, the widening of CSAH 14 from two lanes to four lanes, and the replacement of the existing CSAH 14 bridge over I-35E, along with other improvements.

The city held a public hearing in July 2009 to present the feasibility study to property-owners and to explain the methodology behind the assessment-calculation. The city invited property-owners to ask questions or provide additional information. Several property-owners provided input to the city regarding their specific parcels, appellants did not provide additional data to the city. The city collected the information received from property-owners and "evaluated, researched, and incorporated" the data into the final assessment roll. The city altered some of the assessments based upon updated information provided by property-owners to correct errors in the original assessments and to correct for wetland delineation, easements, and right-of-way dedications.

In October 2011, the city issued a final property assessment roll and levied assessments of approximately $4.2 million against 55 parcels of land. Appellants were assessed a total of $644,526. Appellants appealed the city's special assessment to the

3

district court under Minn. Stat. § 429.081. Following a four-day court trial, the district court issued its thorough and thoughtful findings of fact, conclusions of law and order, determining that appellants' property increased in market value following the interchange project and "received a special benefit in excess of the special assessment levied against them." The district court affirmed the special assessments levied by the city, and this appeal follows.

## D E C I S I O N

Municipalities have the power to levy special assessments on property-owners for capital improvements. Minn. Stat. § 429.021, subd. 1 (2014). "A special assessment is a tax, intended to offset the cost of local improvements such as sewer, water and streets, which is selectively imposed upon the beneficiaries." *Dosedel v. City of Ham Lake*, 414 N.W.2d 751, 755 (Minn. App. 1987). "The cost of any improvement, or any part thereof, may be assessed upon property benefited by the improvement." Minn. Stat. § 429.051 (2014). However, a municipality's power of assessment is limited by three conditions: "(1) the land must receive a special benefit from the improvement being constructed; (2) the assessment must be uniform upon the same class of property; and (3) the assessment may not exceed the special benefit." *David E. McNally Dev. Corp. v. City of Winona*, 686 N.W.2d 553, 558 (Minn. App. 2004) (citing *Carlson-Lang Realty Co. v. City of Windom*, 307 Minn. 368, 369, 240 N.W.2d 517, 519 (1976)). "A city is presumed to have legally assessed its property until proven to the contrary, and the introduction of its assessment roll into evidence constitutes prima facie proof that the assessment does not exceed the special benefit." *Id.* at 559.

4

A person aggrieved by a city's imposition of an assessment may appeal to the district court. Minn. Stat. § 429.081 (2014). The district court may affirm the assessment, set it aside, or order a reassessment. *Id.* The scope of our review of a special assessment is not specified in the statute, *Buettner v. City of St. Cloud*, 277 N.W.2d 199, 202 (Minn. 1979), and, on appeal, we therefore conduct "a careful examination of the record to ascertain whether the evidence as a whole fairly supports the findings of the district court and whether these in turn support its conclusions of law and judgment." *Carlson-Lang*, 307 Minn. at 373, 240 N.W.2d at 521. We view the testimony in the light most favorable to the prevailing party and will not reverse the district court's factual findings unless they are "manifestly contrary" to the evidence. *G.C. Kohlmier, Inc. v. Albin*, 257 Minn. 436, 442-43, 101 N.W.2d 909, 914 (1960); *see also Ewert v. City of Winthrop*, 278 N.W.2d 545, 549 (Minn. 1979) (rejecting a district court's factual findings only "if they are not fairly supported by the evidence as a whole"); *Buettner*, 277 N.W.2d at 203 (applying "clearly erroneous" standard of review). Ultimately, "the burden of proof rests upon the objector to demonstrate [a fee assessment's] invalidity." *Joint Indep. Sch. Dist. No. 287 v. City of Brooklyn Park*, 256 N.W.2d 512, 516 (Minn. 1977).

Appellants challenge the assessment on four grounds: first, that the city failed to comply with statutory authority of Minnesota Statute Chapter 429; second, that the city violated appellants' constitutional rights to equal protection and due process of law by imposing a non-uniform special assessment; third, that the assessment was an illegal attempt to impose a traffic impact fee disguised as a special assessment; and lastly, that the

5

district court erred in determining that assessments levied against appellants' parcels exceeded the benefit of the improvements received. Each argument is addressed in turn.

## I.

Appellants contend that the city failed to comply with the statutory requirements of chapter 429 because it levied a special assessment for an interregional freeway interchange as a local improvement and did not provide methodology material supporting the assessment. Appellants first raised this argument in a summary-judgment motion, which the district court rejected. On appeal from a dispositive motion, the interpretation and construction of statutes is an issue of law subject to de novo review. *Harris v. Cty. of Hennepin*, 679 N.W.2d 728, 731 (Minn. 2004) (citation omitted). "The object of statutory interpretation 'is to ascertain and effectuate the intention of the legislature.'" *Id*. (quoting Minn. Stat. § 645.16 (2002)).

Chapter 429 authorizes a city to levy a special assessment for "any improvement . . . upon property benefited by the improvement." Minn. Stat. § 429.051. "Improvement" is defined as "any type of improvement made under authority granted by section 429.021." Minn. Stat. § 429.011, subd. 5 (2014). Section 429.021 contains 21 kinds of specific, assessable improvements, including:

> To acquire, open, and widen any street, and to improve the same by constructing, reconstructing, and maintaining sidewalks, pavement, gutters, curbs, and vehicle parking strips of any material, or by grading, graveling, oiling, or otherwise improving the same, including the beautification thereof and including storm sewers or other street drainage and connections from sewer, water, or similar mains to curb lines.

Minn. Stat. § 429.021, subd. 1.

6

Appellants cite to *Peterson v. City of Elk River* for the proposition that a project may only be financed by a special assessment if it is a "local improvement" under Minn. Stat. § 429.021. 312 N.W.2d 243, 245 (Minn. 1981). However, *Peterson* is distinguishable. In that case, the supreme court ruled that a city could not levy a special assessment for railroad crossing safety signals because they were not one of the specifically enumerated improvements contained in Minn. Stat. § 429.021. *Id.* By contrast, Minn. Stat. § 429.021 expressly authorizes the city to impose a special assessment to "acquire, open, and widen any street." Minn. Stat. § 429.021, subd. 1; *see also Vill. of Edina v. Joseph*, 264 Minn. 84, 86-88, 119 N.W.2d 809, 812 (1962) (affirming assessment for street improvements along one of city's "main . . . traffic arteries" including bridge work); *EHW Properties v. City of Eagan*, 503 N.W.2d 135, 139-40 (Minn. App. 1993) (affirming special assessment where city widened existing roadway to improve access to "major arterial roadway"); *Black's Law Dictionary* 1557 (9th ed. 2009) (defining "street" as "[a] road or public thoroughfare used for travel in an urban area[.]")). We conclude under our de novo review that Minn. Stat. § 429.021 encompasses improvements to the city's principal interchange at I-35W/CSAH 14.

Next, appellants argue that the city failed to comply with chapter 429's procedural requirements by withholding the methodology used to calculate the assessment. A "reasonable estimate of the total amount to be assessed, and a description of the methodology used to calculate individual assessments for affected parcels," must be shared at a feasibility hearing. Minn. Stat. § 429.031, subd. 1(b). "No error or omission in the report invalidates the proceeding unless it materially prejudices the interests of an owner."

*Id.* Appellants argue the city intentionally omitted the methodology for applying assessments and changed its methodology after the feasibility hearing, resulting in prejudice. The district court rejected this argument on the grounds that the city "sufficiently placed Appellants on notice regarding what factors the City was considering in reaching the ultimate assessment amount" and that "the information presented at the feasibility hearing was sufficient to qualify as a description of the City's assessment methodology" as required by Minn. Stat. § 429.031, subd. 1(b). Our review supports the district court's finding. The city informed landowners in its feasibility study that "[c]osts were allocated to the appropriate parcel based on future land use projections," generalized into "four categories," and that "[e]xisting uses were taken into account that fall within the affected area." The feasibility study reported that the city determined a cost-per-square-foot value. A real estate appraisal firm confirmed the assessment methodology and reviewed the proposed special assessment amounts for each property. The city discussed the feasibility study and the methodology at a public hearing. The record demonstrates that the city properly informed property-owners what factors it would consider in calculating the assessment totals.

Moreover, appellants have not demonstrated prejudice. Prior to undertaking the feasibility study, the city met with appellants and other property-owners to provide them with information about the upcoming proposals. At the public hearing, the city invited property-owners to ask questions or provide additional information about their parcels, and several landowners took advantage of that opportunity. Appellant did not provide additional information to the city relating to the proposed assessment or to the quality of

8

their developable land. In *Hartle v. City of Glencoe*, the supreme court ruled that a modification between an estimate given at a public hearing and the final assessment roll did not require a second hearing or invalidate an assessment where landowners present at the hearing "were aware of the total cost of the improvement project prior to its adoption and had ample opportunity to voice any objections they might have had at that time." 303 Minn. 262, 264, 226 N.W.2d 914, 917 (1975). Under similar reasoning, we determine that appellants had the same opportunity to provide additional information to the city as the other property-owners. Appellants' failure to do so does not invalidate the assessment roll.

**II.**

Appellants argue that the final assessment violated appellants' constitutional guarantees of uniform taxation, equal protection, and due process of law because it resulted in variations in the assessments imposed on properties of the same class. The Minnesota Constitution provides that "[t]axes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes." Minn. Const. art. X, § 1. The Equal Protection Clause of the Fourteenth Amendment guarantees that no state can "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In the context of special assessments, this requirement had traditionally been considered in conjunction with the statutory requirement [of chapter 429] that special assessments be based upon the benefits received by the property assessed. In other words, Minnesota law requires that the assessments on the various properties be roughly proportionate to the benefits accruing to each as a result of the improvement." *Anderson v. City of Bemidji*, 295 N.W.2d 555, 559 (Minn. 1980) (citation and quotation omitted). A

9

district court considers "the comparative benefits accruing to the various lots" in making this determination. *Id*. at 560. A reviewing court will affirm the city's assessment unless it is clearly erroneous. *Buettner*, 277 N.W.2d at 203.

Appellants argue the city deviated from its assessment methodology and treated other properties in the same classification differently. Appellants' properties are classified as commercial property stage 1A. Appellants presented evidence that other properties within this classification received reductions in the final assessment roll to account for wetlands and easements on their land. The district court rejected appellants' constitutional challenge and reasoned that "[t]he failure by Appellants to submit any information to the City between the preliminary assessment roll and the final assessment indicating any inaccuracy in the land use, utility staging, or number of developable acres, does not render the City's assessment non-uniform." We agree.

> The right to uniformity and equality is the right to equal treatment in the apportionment of the tax burden. Uniformity of taxation does not permit the systematic, arbitrary, or intentional valuation of the property of one or a few taxpayers at a substantially higher valuation than that placed on other property of the same class.

*In re McCannel*, 301 N.W.2d 910, 920 (Minn. 1980) (quotation omitted). Here, the city acknowledges it reassessed certain properties based upon updated information provided by property-owners after the initial hearing. However, the supreme court recognizes that "[a]bsolute equality is impracticable" and "the taxpayer may not complain unless the inequality is substantial." *Id*. (quotation omitted). "To show discrimination in the valuation process, a taxpayer must demonstrate that his property was valued on a different basis than

10

other comparable property in the same taxing district, and that this other property was systematically or arbitrarily undervalued." *Id*.

Appellants have not identified evidence in the record that other properties were "systematically or arbitrarily undervalued" as a result of the city's adjustments to the final assessment role. *Id.*; *see also Buzick v. City of Blaine*, 491 N.W.2d 923, 926 (Minn. App. 1992), *aff'd*, 505 N.W.2d 51 (Minn. 1993) ("[T]he mere fact that an assessment on one lot is higher than another does not result in a lack of uniformity."). The city welcomed all property-owners to share additional information with the city regarding their land. Appellants did not take advantage of this opportunity. Appellants have not met their burden of establishing that the comparable properties were systematically or arbitrarily undervalued and we conclude that the district court did not err in rejecting appellants' constitutional challenge.

## III.

Appellants claim the city's special assessment was an illegal traffic impact fee disguised as a lawful assessment. Traffic impact fees are costs based on the amount of traffic generated by a piece of property and the subsequent impact to the adjacent roadway network. The supreme court distinguishes traffic impact fees from special assessments by noting that the "primary difference is that special assessments represent a measure of the *benefit* of public improvements on new or existing development, whereas impact fees typically measure the *cost* of the demand or need for public facilities as a result of new development only." *Country Joe, Inc. v. City of Eagan*, 560 N.W.2d 681, 685 (Minn. 1997) (quotation omitted). Because a municipality is a statutory creature, its authority to impose

11

an impact fee "cannot be implied from the city's municipal planning authority." *Id*. at 683-84.

It is undisputed that the city lacks the authority to levy a traffic impact fee. Appellants claim the special assessment imposed in October 2011 is a traffic impact fee. The district court rejected the argument and concluded that "it is apparent that the City did not levy a traffic impact fee procedurally, or substantively." The district court relied on *Country Joe* to support its analysis. In *Country Joe*, the city adopted a resolution imposing a "road unit connection charge" payable from developers as a condition to issuance of building permits within the city's borders. *Id.* at 682. The purpose of the resolution was to provide "an equitable source of funding . . . in order to accommodate new development and traffic." *Id.* The road unit connection charge was not linked to a special assessment and the funds were not earmarked for a particular project. *Id*. at 682-84. The city argued that the impact fee was lawful. *Id.* The supreme court reserved the issue of whether impact fees are authorized by Minnesota law but rejected the city's argument that the fee was a lawful impact fee, concluding that there was "insufficient evidence that the charge was proportionate to the need created by the development upon which the burden of payment fell." *Id*. at 685-86. Appellants argue that, as in *Country Joe*, the special assessment was a precondition for development approval. However, we agree with the district court that *Country Joe* is distinguishable.

In this case, the city followed the process outlined in chapter 429 to impose a special assessment, the special assessment was proportionate to the need created by the development, and the assessment was based on the benefit received by the assessed parcels.

The city classified the properties into four categories and allocated costs by calculating the net developable area for each parcel, taking into account the gross area for each parcel minus additional available information such as wetland delineations, easements, right-of-way dedications, and other adjustments to developable land. The city complied with the procedural requirements of chapter 429 by providing notice to property-owners and by holding a public hearing. When a city complies with the numerous procedural requirements of chapter 429, the issue of statutory authority vanishes and the city is given leeway to levy the special assessments in any "fair" way. *DeSutter v. Township of Helena*, 489 N.W.2d 236, 237-38 (Minn. App. 1992); *see also Continental Sales & Equip. Co. v. Town of Stuntz*, 256 N.W.2d 546, 550 (Minn. 1977) ("[A]ny method resulting in a fair approximation of the increase in market value for each benefitted parcel may be used. A method which on its face appears to be a fair approximation will be presumed valid, with the burden resting upon the objector to show its invalidity.").

Appellants contend that the city considered vehicle traffic at the interchange during the appraisal process and submitted into evidence e-mails between the city's community development director and the consultants, as well as a spreadsheet detailing the costs. Appellants allege that the spreadsheet contained a "cost factor" column which the city used in its analysis, but later hid from the final assessment role. Even if the city initially considered the impact of traffic at the interchange, we have previously approved the use of traffic studies as a basis for calculating a special assessment. *See EHW Properties*, 503 N.W.2d at 138 (affirming special assessment where appraisers considered "average daily traffic volume" and adjusted final assessment price for properties based on "acreage,

13

location, access, frontage, and average daily traffic"). Thus, even if the city reviewed "average daily traffic" as one factor in calculating the assessment, the record demonstrates that the final assessment was based upon a number of factors. We therefore determine that the district court did not err by concluding that the city did not impose an illegal traffic impact fee.

**IV.**

Appellants argue that the district court erred by determining that the project conferred a special benefit on appellants' property greater than the amount assessed. "An assessment that exceeds the benefit constitutes a taking of property without fair compensation in violation of the Fourteenth Amendment." *McNally*, 686 N.W.2d at 558 (citing *Carlson-Lang*, 307 Minn. at 370, 240 N.W.2d at 519). The district court must engage in an "independent consideration" of the evidence in reaching its decision. *Id*. at 559. On appeal, we "cannot upset this de novo review of the special assessment when the district court's determination is supported by the record as a whole." *Id*. "Our scope of review is a careful examination of the record to determine whether the evidence fairly supports the district court's findings and whether those findings support its conclusions of law." *Id*.

Appellants contend that while the project conferred a general benefit to the public, it did not confer a benefit to appellants' property. A municipality's power of assessment is limited to the extent that the assessment may not exceed the special benefit. *Carlson-Lang*, 307 Minn. at 369, 240 N.W.2d at 519. "Special benefit is measured by the increase in market value of the land resulting from the improvement." *EHW Properties*, 503

14

N.W.2d at 139 (citation omitted). "An increase in market value is the difference between what a willing buyer would pay a willing seller for the property before the improvement and then after the municipality completes the improvement." *Id*. We presume the assessment is legal until proven to the contrary, but this presumption can be overcome if the party appealing the assessment introduces competent evidence that the assessment is greater than the benefit. *McNally*, 686 N.W.2d at 559. If the property-owner rebuts the presumption, the burden shifts to the city and the district court must weigh the parties' evidence and make a factual determination. *Id*.

The city's expert testified that parcel A incurred a benefit of $800,000, parcel B incurred a benefit of $940,000, and parcel C incurred a benefit of $1,050,000. The district court found that "[e]ach quadrant of the interchange benefited by direct access to CSAH 14, substantially improved transportation infrastructure that permits more customers to reach its eventual development as commercial property, and a shorter holding period for development." The district court concluded that appellants' property received a benefit in an amount greater than the amount of the special assessment.

Appellants challenge the expert's testimony and argue that their appraisal expert did not project a measureable change in the market value of the property as a result of the interchange reconstruction. However, the "weight and credibility of the testimony, including that of the expert witnesses, was for the trier of fact to determine." *DeSutter*, 489 N.W.2d at 240 (quotation omitted). We will not "reassess the experts' opinions on appeal." *Id*. Upon "careful examination," *Carlson-Lang*, 307 Minn. at 373, 240 N.W.2d at 521, the evidence as a whole supports the district court's factual findings which, in turn,

support the district court's conclusions of law and judgment that appellant received a special benefit on their property greater than the amount assessed.

**Affirmed.**