Martin M. HARSTAD, et
al., Respondents,

.v.

CITY OF WOODBURY, Appellant.

A16-1937

Court of Appeals of Minnesota.

Filed September 18, 2017

Review Granted Nov. 28, 2017

Gary A. Van Cleve, Rob A. Stefonowicz, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota (for respondents).

George C. Hoff, Justin L. Templin, Hoff Barry, P.A., Eden Prairie, Minnesota (for appellant).

James A. Yarosh, Mark Thieroff, Siegel Brill, P.A., Minneapolis, Minnesota (for amicus curiae Franklin P. Kottschade, et al.).

Susan L. Naughton, League of Minnesota Cities, St. Paul, Minnesota (for amicus curiae League of Minnesota Cities).

Considered and decided by Bratvold, Presiding Judge; Rodenberg, Judge; and Jesson, Judge.

## OPINION

BRATVOLD, Judge

In this declaratory-judgment action, appellant/cross-respondent city challenges the district court's ruling that its road assessment is unlawful. By notice of related appeal, respondent/cross-appellant developer challenges the district court's determinations that its temporary regulatory-takings claim is moot, and that its subdivision application was not approved by operation of law under Minn. Stat. §§ 15.99, subd. 2(a), and 462.358, subd. 3b (2016). We affirm the district court's judgment on all claims.

## FACTS

Appellant/cross-respondent City of Woodbury (the city) has allocated undeveloped land into three "phases" and has identified "roadway needs" caused by "increased traffic and trips that are generat-ed" by expected development within each phase. Roadway needs include reconstructing existing roads, as well as constructing new roads. Respondent/cross-appellant Martin Harstad seeks to develop 77 acres of phase-two land into a 183-home residential community called "Bailey Park."[1] In this appeal, Harstad challenges the city's decision to condition approval of a subdivision application on payment of a road assessment.

The city's ordinance provides that it may not approve a proposed subdivision that is "deemed premature." Woodbury, Minn., Code of Ordinances, § 21-16 (2016). The city may deem a subdivision "premature" if streets "to serve the proposed subdivision" are not "available," which is defined as streets "existing or readily extended and funded" as "consistent with the phasing in the comprehensive plan." Id. § 21-16(e). The city's resolution provides that a new residential development "pays its own way" and "all associated costs" for "public infrastructure" will "be the sole responsibility of the developing property owner." Relevant to this appeal, the city's resolution directs that roadway improvement costs "will normally be collected at the time a property develops per a negotiated major roadway contribution," also called a "major roadway assessment" (MRA). According to a city official, "prematurity can be avoided if an agreed upon MRA contribution is made."

The resolution also sets out a formula to calculate the MRA, dividing the total expected cost of improvements by the net developable acreage in each phase to arrive at a per-acre fee. Based on the MRA formula, the city estimated that phase-two

---

[1] Harstad is the president and chief executive officer of respondent/cross-appellant Harstad Hills, Inc., a land development company, and the managing partner of respondent/cross-appellant Creative Capital Holdings, LP, a land holding company that owns the land on which Harstad seeks to build Bailey Park. We refer to all respondents/cross-appellants as "Harstad."

developers must pay $20,230 per acre to fund necessary road improvements. The record evidence established that the city used this per-acre estimate as a "proposal" in "opening negotiation with the development community." The city memorialized the final MRA imposed against a developer in an agreement and described it as a "negotiated contribution." [2]

On July 23, 2015, Harstad submitted the Bailey Park application to the city. On July 27, 2015, the city sent a letter summarizing deficiencies in the Bailey Park application and stating that it was incomplete. On July 29, Harstad's architect responded in an e-mail. On July 30, the city replied that all deficiencies had been satisfied, except the "items required within 200 feet" of the proposed development. The city stated that "[t]hese items are not necessary for this project to proceed to Planning Commission later in August but the application is considered incomplete from a 60-day rule process without them." Harstad's architect replied that "we will make sure we meet the 200' overlap" on any future resubmittals.

On August 5, 2015, the city project manager completed a five-day review memorandum to determine "[s]ubmittal completeness." The memorandum listed all of the requirements needed for a complete application with boxes next to each requirement for "complete," "not complete," and "not applicable." Two requirements had boxes that were checked "not complete." The 200-foot requirements, which had been incomplete as of July 30, were indicated as "complete" on the memorandum. The memorandum concluded by stating that "[f]urther comments or conditions may need to be addressed" after Harstad submitted revised plans.

The next day, on August 6, the city project manager left Harstad a voice message, telling Harstad not to "put too much stock into that five-day review" because it was "just a checklist" and "just details." The project manager also stated that she understood why Harstad's plans did not include one of the requirements marked incomplete on the memorandum and "I don't want to say ignore it, but basically ignore that." The project manager concluded that she would get back to Harstad after completing a "full comment letter" and meeting with her staff.

On September 18, 2015, the city completed a memorandum containing 64 preliminary plat comments and conditions. The memorandum stated that the developer should submit "revised plans addressing these items," which the city would review, and may result in additional "comments or conditions." The record does not establish that Harstad submitted revised plans.

No further correspondence occurred regarding the Bailey Park application until November 13, 2015, when the city sent Harstad a memorandum stating proposed area and connection charges for Bailey Park, including a "proposed" MRA of $1,389,444. The memorandum stated that "[m]ajor roadway and intersection improvements (i.e., roundabouts, signals, etc.) will be required to accommodate traffic generated by Bailey Park and surrounding areas."

In a meeting with a senior city planner in December 2015, Harstad objected to paying the MRA and argued the city was required to approve the Bailey Park application because the city had failed to deny it within the applicable statutory time periods. In a letter, the city responded that the

**2.** The city deposited MRA funds into two bank accounts; a city official's affidavit states that all MRA "funds have been and are used exclu- sively for major roadway/transportation infra- structure improvements," and "[n]o funds have been diverted to other uses."

Bailey Park application was incomplete because Harstad had not remedied all the deficiencies listed in the July 27 letter. The city told Harstad that the statutory time periods for automatic application approval had not begun to run.

On January 12, 2016, Harstad filed a verified complaint and petition for a writ of mandamus, alleging ten counts that amount to three claims.[3] First, Harstad sought a declaration that the MRA is unauthorized by Minnesota law and unenforceable. Second, Harstad brought an inverse condemnation claim, alleging that the MRA amounted to a temporary regulatory taking (takings claim). Third, Harstad sought relief compelling the city to approve the Bailey Park application because it had failed to deny the application within the statutory review periods under Minn. Stat. §§ 15.99, subd. 2(a), and 462.358, subd. 3b. During this litigation, the Bailey Park application stalled.

The parties filed cross-motions for summary judgment. In September 2016, the district court entered summary judgment in favor of the city on all counts. The district court dismissed the MRA and takings claims without prejudice, concluding they were not ripe for judicial review. The district court also dismissed Harstad's application-approval claim with prejudice, reasoning that the time periods for automatic approval under sections 15.99, subdivision 2(a), and 462.358, subdivision 3b, had not begun to run because the Bailey Park application was incomplete.

In November 2016, after Harstad received reconsideration, the district court vacated its dismissal of the MRA and takings claims. Initially, the district court concluded that the claims were ripe because "Woodbury has indicated to Harstad that

it intends to propose that the MRA be imposed on Harstad's development," and it was in the parties' interests "to be relieved of the uncertainty" about the MRA's legality. The district court also concluded that the MRA was a development "impact fee" and that the city lacked statutory authority under Minn. Stat. § 462.358, subd. 2a, to impose the MRA as a condition of approving a developer's subdivision application. The district court declared the MRA unenforceable and entered partial summary judgment in favor of Harstad on the MRA and takings claims.

The city filed a letter brief with the district court, arguing that the November order declaring the MRA illegal rendered moot Harstad's takings claim and, therefore, the district court should have dismissed that claim. The district court agreed because the city had "neither imposed nor collected" the MRA from Harstad. Therefore, the district court issued a new order that dismissed Harstad's takings claim with prejudice. As a result of all three summary-judgment decisions, the district court dismissed all but two of the counts in Harstad's complaint with prejudice and directed entry of judgment in favor of Harstad on the two remaining MRA counts. This appeal followed.

## ISSUES

I. Did the district court err in its determination that the city lacks express or implied authority under Minn. Stat. § 462.358, subd. 2a, to impose the MRA as a condition of approving a developer's subdivision application?

II. Did the district court err in dismissing as moot Harstad's takings claim?

---

**3.** Counts 1 through 4 allege an application-approval claim; counts 5 through 8 and 10 allege MRA claims, including a declaration that the MRA is illegal; and count 9 alleges an inverse condemnation/regulatory takings claim:

III. Did the district court err in its determination that the Bailey Park application was not automatically approved by law under Minn. Stat. §§ 15.99, subd. 2(a), and 462.358, subd. 3b?

## ANALYSIS

We review a district court's summary-judgment decision de novo, analyzing "whether there are any genuine issues of material fact and whether the district court erred in its application of the law to the facts." *Commerce Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). When there are no genuine issues of material fact, we review de novo the district court's application of the law to the undisputed facts. *Erdman v. Life Time Fitness, Inc.*, 788 N.W.2d 50, 54 (Minn. 2010). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03.

## I. The district court correctly determined that the city lacks authority under Minn. Stat. § 462.358, subd. 2a, to impose the MRA as a condition of approving a developer's subdivision application.

### A. Justiciability

The district court initially determined that Harstad's MRA claim was not ripe because Harstad had not submitted a complete application, the city had not yet approved or disapproved the application, and any alleged injury was hypothetical.

After the parties briefed motions for reconsideration on the issue of ripeness, the district court vacated its prior order after determining that the legality of the MRA was ripe for adjudication. While the parties did not raise the issue of ripeness on appeal, "the existence of a justiciable controversy is essential to this court's exercise of jurisdiction"; therefore, the court "may always raise the issue on its own motion." *Izaak Walton League of Am. Endowment v. Minn. Dep't Nat'l Res.*, 312 Minn. 587, 589, 252 N.W.2d 852, 854 (1977).

A justiciable controversy exists if the claim "(1) involves definite and concrete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion." *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 336-37 (Minn. 2011) (quoting *Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 617-18 (Minn. 2007)). Similar to *McCaughtry*, which examined the justiciability of a declaratory judgement action about the constitutionality of a city ordinance that allowed rental property inspections, this appeal involves the justiciability of a declaratory judgment action about a city's authority to impose the MRA as a condition for approval of a subdivision application.

Under the Declaratory Judgments Act, courts have the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Minn. Stat. § 555.01 (2016). Because Harstad's application has not been approved or disapproved, the precise issue is ripeness, which requires that Harstad must show that the city's authority to impose the MRA is not merely

hypothetical or a "future possibility." *Lee v. Delmont*, 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949). Declaratory judgment actions allow parties "to be relieved of an uncertainty and insecurity arising out of an actual controversy" about their legal rights "before those rights actually have been invaded." *McCaughtry*, 808 N.W.2d at 339. A declaratory judgment claim is ripe if the complaining party "is possessed of a judicially protectible right or status which is placed in jeopardy by the ripe or ripening seeds of an actual controversy with an adversary party." *Id.* (quoting *Minneapolis Fed'n of Men Teachers, Local 238, AFL v. Bd. of Educ. of Minneapolis*, 238 Minn. 154, 157, 56 N.W.2d 203, 205-06 (1952)).

We conclude that Harstad's declaratory judgment claim is ripe for judicial determination. The city's authority to impose the MRA, pursuant to its resolution and as a condition for approval of a subdivision application, poses an actual controversy between these adverse parties about a purely legal question, *i.e.*, the interpretation of section 462.358, subdivision 2a. There is no uncertainty about whether the city will impose the MRA on a new development. In fact, the city's resolution states that a new residential development must "pay[ ] its own way" and provides that "[m]ajor roadway improvement cost *will normally be collected* at the time a property develops per a negotiated roadway contribution." (Emphasis added.) The only uncertainty is the final amount of the MRA. We have found similar legal questions to be ripe in situations where the status quo has not been altered. *See, e.g., Minneapolis Fed'n of Men Teachers*, 238 Minn. at 157-58, 56 N.W.2d at 205-06 (holding controversy over validity of board resolution was ripe even though board had not yet taken action consistent with its resolution).

The city's position on appeal is that section 462.358 "recognizes that cities can condition approval on requiring developers to share in the cost of infrastructure" such as streets and other roadway improvements outside the proposed development. In contrast, Harstad contends that section 462.358 conveys neither express nor implied authority for the MRA. Further development of a factual record will not affect our interpretation of the statute because Harstad is challenging whether the city has authority to impose the MRA as a condition for approval of *any* subdivision application and is not merely challenging the MRA imposed for the Bailey Park application. Harstad's declaratory judgment action demonstrates the ripening seeds of an actual controversy and our decision will resolve uncertainty over the parties' legal rights. *See McCaughtry*, 808 N.W.2d at 340.

## B. Express and Implied Authority

The City of Woodbury is a statutory city; thus, it "has no inherent powers beyond those expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred." *Country Joe, Inc. v. City of Eagan*, 560 N.W.2d 681, 683 (Minn. 1997) (quotation omitted); *see* Minn. Stat. § 410.015 (2016) (defining "statutory city" as "any city which has not adopted a home rule charter."). The city argues it has express authority to impose the MRA under the plain language of Minn. Stat. § 462.358, subd. 2a. Harstad disagrees, arguing that subdivision 2a grants planning authority, not financing authority.

Section 462.358, subdivision 1a, provides that "a municipality may by ordinance" regulate the subdivision of land to, among other things, facilitate "adequate provision for transportation." Minn. Stat. § 462.358,

subd. 1a. Subdivision 2a states, in relevant part:

> The standards and requirements in the regulations [authorized by subdivision 1a] may address without limitation: the size, location, grading, and improvement of lots, structures, public areas, *streets,* [and] *roads* .... The regulations may prohibit the issuance of permits or approvals for any tracts, lots, or parcels for which required subdivision approval has not been obtained.
>
> The regulations may permit the municipality to *condition its approval on the construction and installation of* sewers, *streets,* electric, gas, drainage, and water facilities, and similar utilities and improvements *or, in lieu thereof, on the receipt by the municipality of a cash deposit,* certified check, irrevocable letter of credit, bond, *or other financial security* in an amount and with surety and conditions *sufficient to assure the municipality that the utilities and improvements will be constructed or installed* according to the specifications of the municipality.
>
> \* \* \*
>
> When the applicant vouches, by certified letter to the municipality, that the conditions required by the municipality for approval under this subdivision have been satisfied, the municipality has 30 days to *release and return to the applicant any and all financial securities tied to the requirements.*

Minn. Stat. § 462.358, subd. 2a (emphasis added).

The parties' conflicting interpretations of subdivision 2a raise a legal issue, which we review de novo. *Christianson v. Henke,* 831 N.W.2d 532, 535 (Minn. 2013). The goal of all statutory interpretation is "to ascertain and effectuate" the legislature's intent. Minn. Stat. § 645.16 (2016). The first step in the statutory analysis is to determine whether the statute is ambiguous. *Christianson,* 831 N.W.2d at 536. "A statute is only ambiguous if its language is subject to more than one reasonable interpretation." *Id.* at 537. In making this determination, we must give effect to all statutory provisions and construe "words and phrases according to their plain and ordinary meaning." *Id.* at 536-37 (quotation omitted). "Multiple parts of a statute may be read together so as to ascertain whether the statute is ambiguous." *Id.* at 537. If the statute is unambiguous, we must enforce "the letter of the law." Minn. Stat. § 645.16. If the statute is ambiguous, we may consider other canons of statutory interpretation to determine its meaning. *Id.; Christianson,* 831 N.W.2d at 537.

We begin our statutory analysis by determining whether subdivision 2a is ambiguous. The city maintains that subdivision 2a's "open-ended language" unambiguously authorizes it to condition subdivision approval on a developer's agreement to pay an MRA that funds necessary road improvements "without limitation on location." The city appears to claim, and Harstad does not disagree, that the MRA is a regulation adopted pursuant to city ordinance. *See* Minn. Stat. § 462.358, subds. 1a, 2a (authorizing municipalities to adopt ordinances regulating subdivisions). Harstad argues that, while subdivision 2a provides municipal authority to condition subdivision approval on a developer's agreement to fund roadway improvements *within* subdivision boundaries and its perimeter, subdivision 2a does not authorize an MRA to pay for off-site road improvements.

We conclude that subdivision 2a is unambiguous and does not by its plain language authorize the city to condition subdivision approval on payment of a road assessment. In fact, subdivision 2a does

not authorize collection of any type of assessment. Rather, subdivision 2a authorizes city planning. By its plain language, subdivision 2a allows the city to condition subdivision approval on the construction or installation of road improvements, or on the receipt "of a cash deposit, certified check, irrevocable letter of credit, bond, or other financial security" sufficient "to assure" the city that road construction or installation will be completed.

█ The city appears to argue that the MRA is like a "cash deposit" or "other financial security," but we disagree. While chapter 462 does not define "cash deposit," the common and ordinary meaning of deposit is "money or other property" given "to another who promises to preserve it or to use it and return it in kind." *Black's Law Dictionary* 533 (10th ed. 2014); *see Eclipse Architectural Grp., Inc. v. Lam*, 814 N.W.2d 692, 701 (Minn. 2012) (relying on dictionary definition of statutory term to determine common and ordinary meaning in absence of statutory definition). In contrast, an "assessment" is the "[i]mposition of something, such as a tax or fine, according to an established rate." *Black's Law Dictionary* 139 (10th ed. 2014). In other words, subdivision 2a allows a city to require a "cash deposit," which, we conclude based on the term's common and ordinary meaning, is money held by a municipality and must be preserved or returned "in kind." In fact, subdivision 2a

expressly requires a city to hold the cash deposit or other financial security until completion of road construction (or other improvements) on which approval is conditioned, after which the deposit or security is returned.[4] But subdivision 2a does not authorize a road assessment. Therefore, we conclude that subdivision 2a does not expressly authorize the city to impose the MRA.

█ Next, we must consider whether subdivision 2a implies the city is authorized to impose a road assessment as necessary to aid expressly granted powers.[5] The district court concluded subdivision 2a implies that the city may charge developers for road improvements *within* subdivision boundaries. The city argues the district court violated the rule of statutory construction that courts "are not free to write restrictions into statutes where they do not" exist by inserting "restrictive language" into subdivision 2a. *See Reider v. Anoka-Hennepin Sch. Dist. No. 11*, 728 N.W.2d 246, 250 (Minn. 2007) (rejecting party's construction of statute because it would "add terms that the legislature has omitted"). The district court's analysis is not based on any statutory language, so we reject it. Instead, we focus on whether subdivision 2a implies that the city may charge developers an assessment to fund *any* road improvement, regardless of whether the road is within or outside a particular subdivision. Harstad argues that

4. Subdivision 2a states: "When the applicant vouches, by certified letter to the municipality, that the conditions required by the municipality for approval under this subdivision have been satisfied, the municipality has 30 days to *release and return to the applicant any and all financial securities tied to the requirements*." Minn. Stat. § 462.358, subd. 2a (emphasis added).

5. The city relies on a municipality's expressly granted power to enter into development agreements. Minn. Stat. § 462.358, subd. 2a

("The regulations may permit a municipality to condition its approval ... and to execute development contacts embodying the terms and conditions of approval."). We are not persuaded. First, the explicit power to execute a contract is not the explicit power to assess a roadway fee. Second, the power to enter into a development contract does not necessarily imply the power to assess a roadway fee for the reasons articulated in *Country Joe*, 560 N.W.2d at 684.

*Country Joe's* holding prevents the city from relying on subdivision 2a as a source of implied authority to finance road improvements.[6]

In *Country Joe*, the City of Eagan "adopted a resolution imposing a road unit connection charge payable as a condition to issuance of all building permits within the city." 560 N.W.2d at 682. The city used the proceeds to fund major street improvements "in order to accommodate new development and traffic generated from future anticipated residential, commercial and industrial construction." *Id.* The city argued it had implied authority under the Minnesota Municipal Planning Act (MPA) to impose the road connection charge. *Id.* at 683; *see* Minn. Stat. §§ 462.351-.365 (2016) (MPA).

The supreme court disagreed, holding that the MPA provides cities with broad *planning* powers, but that "does not necessarily imply that the legislature similarly intended to confer broad *financing* powers under the act." *Country Joe*, 560 N.W.2d at 684 (emphasis added); *see also First Baptist Church of St. Paul v. City of St. Paul*, 884 N.W.2d 355, 361 (Minn. 2016) ("The crucial question is not what power a city exercises when it *uses* the funds collected, but rather what power a city exer-

cises when it *collects* the funds."). *Country Joe* therefore held that "the authority to impose a road unit connection charge cannot be implied from the city's municipal planning authority." 560 N.W.2d at 684.

We reach the same conclusion here. While the city correctly notes that *Country Joe* did not explicitly analyze subdivision 2a, the decision highlighted two key points regarding municipal road-financing authority. First, the legislature has specifically authorized special assessments as the municipal funding mechanism for road improvements.[7] *Id.*; *see* Minn. Stat. §§ 429.021, subd. 1(1) (providing express municipal authority to improve streets), .051 (2016) (stating that the cost of any improvement "may be assessed upon property benefited by the improvement"). Thus, "no funding mechanism need be implied to effectuate the legislative grant of authority to undertake road improvements." [8] *Country Joe*, 560 N.W.2d at 684.

Second, the legislature has authorized municipalities to assess water- and sewer-connection charges against developers to fund public water and sewer improvements made necessary by development. *Id.*; *see* Minn. Stat. § 444.075, subd. 3

6. Harstad also argues, and the district court determined, that the MRA is a development impact fee. *See Country Joe*, 560 N.W.2d at 685 (defining "impact fee" as a "form of development exaction," in which the amount assessed a developer reflects "the cost of infrastructure improvements necessitated by the development itself"). It is an open question in Minnesota whether development impact fees are authorized by statute. *Id.* at 685-86 (declining to decide whether impact fees are authorized because road connection charge in that case was not an impact fee). Unlike the city in *Country Joe*, the city here argues that the MRA is *not* an impact fee and instead relies solely on Minn. Stat. § 462.358, subd. 2a, for authority to impose the MRA. We conclude it is unnecessary to analyze whether the MRA is a development impact fee because

chapter 462 does not use that term. Instead, we focus on the statutory analysis.

7. Although the MRA includes the word "assessment," it is undisputed that the MRA is not a chapter 429 special assessment.

8. The amici point out that municipalities also have the option to fund public road improvements with taxes. Amici curiae Kottschade, et al., argue that the MRA is an unlawful tax. But neither the city nor Harstad argue the MRA is a tax. Thus, we decline to consider this issue because "[a]mici are not permitted to raise new issues on appeal." *Wilson v. Mortg. Res. Ctr., Inc.*, 888 N.W.2d 452, 457 (Minn. 2016).

(2016) (stating that cities "may impose just and equitable charges for the use" of and connections with waterworks, sanitary sewer, and storm water systems). *Country Joe* reasoned that the legislature's failure to include road charges under the same statutory section was not the result of "legislative oversight" because it passed "statutory provisions expressly establishing special assessments as the mechanism by which cities are empowered to finance road improvements." 560 N.W.2d at 684.

The supreme court decided *Country Joe* in 1997, and, since that time, the legislature has not amended the relevant language of subdivision 2a or the provisions authorizing cities to impose special assessments and water- and sewer-connection charges.[9] *Compare* Minn. Stat. §§ 429.051 (2016), *and* 444.075, subd. 3 (2016), *and* 462.358, subd. 2a (2016), *with* Minn. Stat. §§ 429.051 (1996), *and* 444.075, subd. 3 (1996), *and* 462.358, subd. 2a (1996). Had the legislature disagreed with *Country Joe*'s holding, it could have amended any or all of the above-cited statutory provisions.[10] Based on the supreme court's analysis in *Country Joe*, we conclude that subdivision 2a, which is part of the MPA, is not a source of implied authority for the city to impose the MRA.

In sum, the MRA is invalid and unenforceable because the city lacked express or implied authority under Minn. Stat. § 462.358, subd. 2a, to impose the MRA as a condition of approving a developer's subdivision application. *See N. States Power Co. v. City of Granite Falls*, 463 N.W.2d 541, 545 (Minn. App. 1990) (affirming district court order declaring ordinance invalid and unenforceable because it exceeded city's statutory authority), *review denied* (Minn. Jan. 14, 1991). Accordingly, the district court did not err in granting Harstad judgment on its MRA claim.

## II. The district court did not err in dismissing as moot Harstad's takings claim.

 This court reviews de novo whether a cause of action is moot. *Isaacs v. Am. Iron & Steel Co.*, 690 N.W.2d 373, 376 (Minn. App. 2004), *review denied* (Minn. Apr. 4, 2005). "[M]ootness can be described as the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Kahn v. Griffin*, 701 N.W.2d 815, 821 (Minn. 2005) (quotation omitted). A district

---

9. The legislature has amended the cited statutory provisions, but those amendments are not relevant to our statutory analysis.

10. The legislature also could have passed a law specifically authorizing development impact fees as a new source of municipal funding for road improvements, as many other states have done. *See generally* Floyd B. Olson, *The Future of Impact Fees in Minnesota*, 24 Wm. Mitchell L. Rev. 635 (1998) (discussing impact fees in Minnesota and other states); *see also, e.g.*, 605 Ill. Comp. Stat. 5/5-904 (2016) ("An impact fee payable by a developer shall not exceed a proportionate share of costs incurred by a unit of local government which are specifically and uniquely attributable to the new development paying the fee in providing road improve-

ments."); Wis. Stat. § 66.0617(6)(a) (2016) (requiring impact fees to "bear a rational relationship to the need for new, expanded or improved public facilities that are required to serve land development"). The amici highlight a policy debate surrounding whether an impact-fee enabling statute would be prudent. But our role is to interpret and apply the law as it exists; we leave lawmaking to the legislature and respect the legislature's policy decision not to adopt an impact-fee enabling statute. *See In re Welfare of Children of N.F.*, 749 N.W.2d 802, 810 n.4 (Minn. 2008) ("Whether we agree or disagree with that policy decision is of no importance. Our role is limited to interpreting the law as the legislature has enacted it.").

court may dismiss a cause of action as moot "if an event occurs that resolves the issue or renders it impossible to grant effective relief." *Isaacs*, 690 N.W.2d at 376.

■■■ Harstad argues the district court erred in dismissing its takings claim as moot. The district court concluded that, because the MRA is unauthorized and the city has not collected the MRA from Harstad, the takings claim is moot. We agree with the district court. The complaint alleged that a taking occurred "because the City is conditioning the approval of the development upon the Major Roadway Assessment fee." It is undisputed that Harstad did not pay the MRA because it sued the city before completing the subdivision-approval process. Because we hold that the MRA is unauthorized, the proposed MRA is invalid and the city cannot impose or collect the MRA from Harstad. Therefore, Harstad's takings claim is moot. *See Country Joe*, 560 N.W.2d at 687 n.7 (declining to address contractor's takings claim because the road connection charge was unenforceable).

Harstad nonetheless argues that the city's mere *demand* for the MRA during the approval process was a temporary regulatory taking. Harstad contends that the MRA "was an imposition that thwarted the use and development of [its] property from the time of the City's demand until it was declared illegal." Harstad relies on *Koontz v. St. Johns River Water Mgmt. Dist.*, which held that a local government's imposition of a monetary exaction against a landowner as a condition of granting a land-use permit must have a "nexus" and "rough proportionality" with the purpose served by the exaction. ── U.S. ──, 133 S.Ct. 2586, 2599-2600, 186 L.Ed.2d 697

(2013); *see also Murr v. Wisconsin*, ── U.S. ──, 137 S.Ct. 1933, 1942-43, 198 L.Ed.2d 497 (2017) (discussing regulatory takings).

Unlike in *Koontz*, where the local government denied the land-use application because the landowner refused to yield to the government's demands, 133 S.Ct. at 2591, the city here has not collected the assessment on which the takings claim is based, nor did it deny the Bailey Park application based on Harstad's refusal to pay the MRA. *Koontz* stated that "[w]here the permit is denied and the condition is never imposed, nothing has been taken." *Id.* at 2597. That principle applies here. Because the city has not denied the Bailey Park application or imposed the MRA, nothing has been taken. Because we hold that the MRA is invalid and unenforceable, we conclude that the district court did not err in dismissing Harstad's takings claim as moot.

### III. The district court correctly determined that the Bailey Park application was not automatically approved by law under Minn. Stat. §§ 15.99, subd. 2(a), and 462.358, subd. 3b.

Section 15.99, subdivision 2(a), states that an "agency's" failure to "deny within 60 days a written request relating to zoning" results in automatic approval of the request. The 60-day review period does not begin to run until an agency receives a "written request *containing all information*" required by law, ordinance, or agency policy. (Emphasis added.)[11] If an agency receives an incomplete request, "the 60-day limit starts over only if the agency sends written notice within 15 business

---

11. The city has adopted ordinances providing the requirements for complete zoning and subdivision applications. *See* Woodbury, Minn., Code of Ordinances, §§ 21-49 (subdivi- sion applications), 24-41 (conditional-use permit applications), 24-208 (planned-unit development applications).

days of receipt of the request telling the requester what information is missing." Minn. Stat. § 15.99, subd. 2(a).

Similarly, section 462.358, subdivision 3b, requires a city to preliminarily approve or disapprove a subdivision application within 120 days of the developer's delivery of an "application completed in compliance with the municipal ordinance." A city's failure to deny the application within the 120-day period results in automatic preliminary approval, and the city must "execute a certificate to that effect" upon demand. Minn. Stat. § 462.358, subd. 3b.

 The legislature enacted the automatic-approval provisions "to establish deadlines for local governments to take action on zoning applications." *Perschbacher v. Freeborn Cty. Bd. of Comm'rs*, 883 N.W.2d 637, 642 (Minn. App. 2016) (quotation omitted). Automatic approval is a "harsh, extraordinary remedy." *Moreno v. City of Minneapolis*, 676 N.W.2d 1, 6 (Minn. App. 2004). Courts must narrowly construe the automatic-approval provisions against the penalty. *Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 543 (Minn. 2007). But "[w]hen a city has failed to satisfy its clear requirements, the remedy shall be granted." *Moreno*, 676 N.W.2d at 6. Because our caselaw does not address section 462.358's automatic-approval provision, we interpret it consistently with caselaw interpreting section 15.99's automatic-approval provision. *See Kolton v. County of Anoka*, 645 N.W.2d 403, 408 (Minn. 2002) (relying on caselaw interpreting a similar, but "not identical," federal statute while construing a state statute).

It is undisputed that the Bailey Park application falls within the ambit of sections 15.99 and 462.358. *See* Minn. Stat. § 15.99, subd. 1(b) (2016) (defining "agen-

cy" to include a statutory city); *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 291 (Minn. 2013) (defining a "written request relating to zoning"); *Calm Waters, LLC v. Kanabec Cty. Bd. of Comm'rs*, 756 N.W.2d 716, 719 (Minn. 2008) (assuming without deciding that a subdivision application is a "written request relating to zoning" under section 15.99). It is also undisputed that the city's July 27 letter provided Harstad with written notice of application deficiencies and satisfied the 15-day notice requirement under section 15.99, subdivision 3(a), to toll the 60-day review period. *See Calm Waters*, 756 N.W.2d at 720 (concluding that the 60-day review period for zoning request "restarted" when county timely notified applicant of incomplete application).

 The question is whether Harstad submitted a complete application after July 27 to trigger the 120-day review period for subdivision applications and an additional 60-day review period for zoning requests. Because none of the parties argue that there are any genuine issues of material fact, we will review the undisputed facts to determine whether the city is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03; *Erdman*, 788 N.W.2d at 54. Harstad acknowledges that the application was incomplete through at least August 5, as reflected in the city's August 5 review memorandum. Harstad argues that the application was complete on August 6 after the city project manager said in a voicemail that the items listed on the August 5 memorandum were "just details" and instructed Harstad not to "put too much stock into" the memorandum and to "basically ignore" one of the incomplete requirements.[12] Harstad points to no other evidence of application completeness.

---

12. The city does not dispute that the project manager who left the voicemail had authority

to deem the Bailey Park application complete. *See Calm Waters*, 756 N.W.2d at 721 (con-

If the Bailey Park application was complete on August 6, then the 60-day review period expired on October 5, 2015, and the 120-day review period expired on December 4, 2015. Therefore, if Harstad's argument prevails, the application is deemed approved by operation of law under sections 15.99 and 462.358.[13] *See Moreno*, 676 N.W.2d at 5 ("When the city fails to adhere to the time limit, the result must be that the application was statutorily approved as a matter of law.").

The district court concluded that the Bailey Park application was incomplete and, therefore, did not trigger the statutory time periods for automatic approval because the "only written documentation from Woodbury states that the Application is incomplete," "nothing in the voice message from [the city project manager] states that the Application was complete," and "[a]t most, the voice message was ambiguous." The district court also concluded that "[a]n ambiguous oral representation will not trump a written document and will not start the time running for approval of an application." [14]

██ Harstad argues that the district court erred when it stated that oral representations may not "trump" written evidence. Harstad is correct that oral record-

ings may be considered in a summary-judgment proceeding. *See Lundgren v. Eustermann*, 370 N.W.2d 877, 881 n.1 (Minn. 1985) (stating that a district court in deciding a summary-judgment motion "may consider oral testimony . . . and any other material that would be admissible in evidence or otherwise usable at trial."); *see also, e.g., Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 27-28, 27 n.9 (Minn. 1982) (stating that proper admission of tape recording requires foundation including "seven foundational elements"). Therefore, we conclude that the district court erred by rejecting oral statements in favor of written evidence.

Nonetheless, the district court correctly determined, based on undisputed facts, that the Bailey Park application was incomplete. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997) (stating that, on summary judgment, "the court is not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented."). The August 6 voicemail did not affirmatively state or imply that the application was complete. Although the project manager told Harstad

---

cluding that agency director had "authority to act on behalf of [the] department" in agreeing to an extension of the 60-day review period).

13. Under section 15.99, a city may also extend the review period by another 60 days upon written notice to the applicant made within the original 60-day period. Minn. Stat. § 15.99, subd. 3(f) (2016). Similarly, under section 462.358, a city may extend the 120-day period upon agreement with the developer. Minn. Stat. § 462.358, subd. 3b. There is no claim that either statutory extension occurred in this case.

14. We note that this court has applied equitable estoppel to estop a municipality from asserting that an application was not automati-

cally approved by operation of law. *Semler Constr., Inc. v. City of Hanover*, 667 N.W.2d 457, 466 (Minn. App. 2003) (applying equitable estoppel against city to preclude it from denying developer's final-plat approval request because city had contracted with the developer to extend the one-year preliminary-plat review process to eight years), *review denied* (Minn. Oct. 29, 2003); *see also N. States Power Co. v. City of Mendota Heights*, 646 N.W.2d 919, 925 (Minn. App. 2002) (concluding that developer was not estopped from asserting its right to automatic approval), *review denied* (Minn. Sept. 25, 2002). Harstad does not raise equitable estoppel; therefore, we do not address it.

to "basically ignore" a deficiency listed in the August 5 review memorandum, she also told Harstad that she would complete a "full comment letter" after a staff meeting. In fact, the city submitted additional comments in September and directed Harstad to submit revised plans.

Harstad argues that the city's "actions" in processing the application after the August 6 voicemail "serve[d] only to confirm that the Application was complete." But the record evidence establishes that the city began processing the incomplete application while waiting for Harstad to submit revised plans that cured the deficiencies noted. There is no evidence that Harstad ever submitted another application or revised plans. The city's correspondence to Harstad in November and December 2015 also stated that the application remained incomplete. Therefore, the statutory periods for automatic approval under sections 15.99, subdivision 2(a), and 462.358, subdivision 3b, were not triggered by the Bailey Park application, and the district court did not err in granting summary judgment to the city on Harstad's application-approval claim.

## DECISION

Because the city lacks express or implied authority under Minn. Stat. § 462.358, subd. 2a, to impose the MRA, we affirm the judgment in favor of Harstad on the MRA claim. We also affirm the dismissal of Harstad's temporary regulatory-takings claim as moot because the MRA is unauthorized by state law and invalid, and the city has not collected the MRA from Harstad. Finally, because the undisputed facts establish that the Bailey Park application was incomplete, the time periods for automatic application approval under Minn. Stat. §§ 15.99, subd. 2(a), and 462.358, subd. 3b, have not begun to run. Therefore, we affirm the judgment in favor

of the city on the application-approval claim.

**Affirmed.**