ANDERSON, Justice.
We are asked to decide, in the context of a subdivision-application process, whether Minn. Stat. § 462.358, subd. 2a (2016), authorizes a statutory city to impose an infrastructure charge for future road-improvement projects. Respondent Martin Harstad[1] submitted an application to appellant City of Woodbury for approval to subdivide and develop a parcel of land. Before he completed his application, Woodbury sent Harstad a memorandum outlining proposed charges for the subdivision, including an infrastructure charge as determined by Woodbury's Major Roadway Assessment program. Harstad disputes the authority of Woodbury to condition approval of his subdivision application upon payment of the roadway charges and brought this action against Woodbury. The district court and the court of appeals concluded that Woodbury lacks statutory authority to impose an infrastructure charge *543 under Minn. Stat. § 462.358, subd. 2(a). We affirm.
FACTS
In July 2015, Martin Harstad submitted an application to the City of Woodbury for approval to subdivide approximately 77 acres of land in Woodbury for the purpose of developing a 183-unit residential community called Bailey Park. Woodbury received the application but regarded it as incomplete and sought additional information from Harstad about his subdivision plan. In December 2015, Woodbury sent Harstad a memorandum outlining proposed charges for the subdivision, including a $1,389,444 infrastructure charge.[2] The memorandum described the infrastructure charge as the amount to be paid for "[m]ajor roadway and intersection improvements (i.e. roundabouts, signals, etc.)," which would be "required to accommodate traffic generated by Bailey Park and surrounding areas." Before his application was completed, Harstad brought an action against Woodbury, challenging the infrastructure charge.
It is important to understand that the charge at issue here is not the traditional street assessment provided for in Minn. Stat. §§ 429.021, 429.051 (2016). It is undisputed that cities have the authority to assess property for road and street improvements and that these assessments are specifically permitted by state law. Minn. Stat. §§ 429.021, subd. 1(1), 429.051. Here, Woodbury relies exclusively on city-ordinance provisions and Minn. Stat. § 462.358, subd. 2a, as authority for the infrastructure charge; it does not rely on chapter 429 of the Minnesota Statutes.[3]
Woodbury adopted the infrastructure charge by resolution in 2011 as part of a larger set of provisions concerning "Public Infrastructure Improvements for New Residential Development." The resolution describes the infrastructure charge as "[m]ajor roadway costs [that] will be attributed to properties regardless of zoning, size or homestead status,"[4] which "will normally be collected at the time a property develops per a negotiated major roadway contribution." The resolution's emphasis on developer contribution is consistent with its stated policy "that new residential development pays its own way and that all associated costs for the installation of public infrastructure to serve new residential development be the sole responsibility of the developing property owner."
Woodbury's senior planner has described the infrastructure charge as "a mechanism that the city has created to fund the infrastructure improvements that are identified within the comprehensive plan ... to create the necessary roadways to serve the burden of the development within our development areas."[5] According *544 to Woodbury's senior planner, the infrastructure charge "is based on significant review" and "an analysis of the costs to implement [Woodbury's] comprehensive plan." In practice, the infrastructure charge has a crucial connection to Woodbury's process of approving or denying subdivision applications: a subdivision applicant can avoid having an application deemed "premature"[6] and denied "if an agreed-upon [infrastructure-charge] contribution is made."
According to Woodbury's senior planner, Woodbury calculates an initial infrastructure charge based on the location of the proposed development and the cost of all of the "roadway improvements [and] roadway segments that are necessary to be improved to facilitate development" in the corresponding part of the city. The initial infrastructure charge has occasionally changed slightly after negotiation between the developer and Woodbury. Once the applicant pays the infrastructure charge, the funds are held in a "dedicated funding account," which Woodbury draws from, as needed, to finance any of the predetermined road-improvement projects outside the area to be developed. Additionally, the senior planner explained that the timing of road improvements depends on when "development occurs and funding is identified."
When Harstad applied for subdivision approval, Woodbury calculated the infrastructure charge for his application at $20,230 per acre. Woodbury used this per-acre number to calculate the $1,389,444 infrastructure charge it proposed to Harstad.
Harstad refused to pay the infrastructure charge or to negotiate the amount of the charge. Instead, he brought this action against Woodbury. Among other relief, he requested that the district court issue a declaratory judgment concluding that Woodbury's infrastructure charge is "illegal, null and void, unenforceable and otherwise contrary to Minnesota law."
In response to cross-motions for summary judgment, the district court granted summary judgment to Harstad on his claim that Woodbury has no statutory authority to impose an infrastructure charge, reasoning that Woodbury lacked authority under Minn. Stat. § 462.358, subd. 2a, "to impose fees for construction of new roads or improvements to existing roads outside of the development which may become necessary in the future due to increased traffic resulting from a development."
Woodbury appealed the district court's decision and the court of appeals affirmed, agreeing that Woodbury does not have authority to impose the infrastructure *545 charge. Harstad v. City of Woodbury , 902 N.W.2d 64, 79 (Minn. App. 2017). The court of appeals reasoned that the infrastructure charge is a "road assessment" and that Minn. Stat. § 462.358 does not authorize Woodbury "to condition subdivision approval on payment of a road assessment" or to collect "any type of assessment." Harstad , 902 N.W.2d at 72-73. The court of appeals also rejected Woodbury's alternative argument that its power to enter into development contracts under Minn. Stat. § 462.358, subd. 2a, independently authorizes the infrastructure charge. Harstad , 902 N.W.2d at 73 n.5. According to the court of appeals, a city's "explicit power to execute a contract is not the explicit power to assess a roadway fee." Id.
We granted Woodbury's petition for review.
ANALYSIS
Harstad argues that Woodbury has no statutory authority to impose conditions on the approval of a subdivision application in the form of an infrastructure charge. Woodbury argues that Minn. Stat. § 462.358, subd. 2a, grants it the authority it needs for the infrastructure charge at issue. The validity of Woodbury's infrastructure charge thus depends on our interpretation of Minn. Stat. § 462.358, subd. 2a. Statutory interpretation is an issue, which we review de novo. Christianson v. Henke , 831 N.W.2d 532, 535 (Minn. 2013).
Woodbury is a statutory city, which means that it "has not adopted a home rule charter," Minn. Stat. § 410.015 (2016), and it "has no inherent powers beyond those expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred," Country Joe, Inc. v. City of Eagan , 560 N.W.2d 681, 683 (Minn. 1997) (citation omitted) (internal quotation marks omitted). In other words, Woodbury must have explicit or implicit authority to impose its infrastructure charge. Because Woodbury has specifically disclaimed that it has implied authority to impose the infrastructure charge, we need decide only whether Minn. Stat. § 462.358, subd. 2a, explicitly authorizes Woodbury's infrastructure charge.
Minnesota Statutes § 462.358 (2016) grants statutory cities the authority to pass regulations "for the review and approval or disapproval" of applications for the subdivision of land within a municipality. Id. , subd. 1a. The statute provides this general authority and clarifies that municipalities may adopt these regulations "[t]o protect and promote the public health, safety, and general welfare," among other concerns. Id. The subdivisions of section 462.358 describe a city's powers to review, approve, or deny subdivision applications.
Subdivision 2a of the statute describes the terms of subdivision regulations. It lists the utilities, built environment, and natural spaces that a city's subdivision regulations "may address without limitation." Id. , subd. 2a. It also outlines the municipality's power to "condition its approval" of a subdivision application in certain circumstances. Id.
Although the parties disagree on whether the statute authorizes Woodbury to condition subdivision approval on the payment of an infrastructure charge, neither argues that it is ambiguous. Harstad asserts that Minn. Stat. § 462.358 does not authorize Woodbury's infrastructure charge.[7] Woodbury and amicus, the *546 League of Minnesota Cities, contend that Woodbury has explicit authority under section 462.358, subdivision 2a, to impose an infrastructure charge. Woodbury and the League of Minnesota Cities point to two separate provisions in subdivision 2a, arguing that each explicitly authorizes Woodbury to impose an infrastructure charge as a condition on city approval of a subdivision application. We disagree and conclude that no part of Minn. Stat. § 462.358 authorizes a statutory city to impose an infrastructure charge.[8]
When we interpret a statute, we seek to "ascertain and effectuate" the Legislature's intent. Minn. Stat. § 645.16 (2016). "When the words of a law in their application to an existing situation are clear and free from all ambiguity," id. , "our role is to enforce the language of the statute and not explore the spirit or purpose of the law," Christianson , 831 N.W.2d at 537 (citations omitted) (internal quotation marks omitted). In doing so, we construe the law "to give effect to all its provisions." Minn. Stat. § 645.16. We presume that "the legislature intends the entire statute to be effective and certain." Minn. Stat. § 645.17(2) (2016).
In ascertaining the meaning of a statute, we construe "words and phrases ... according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2016). We also "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." Am. Family Ins. Grp. v. Schroedl , 616 N.W.2d 273, 277 (Minn. 2000).
A.
The first provision that Woodbury relies on as authority for the infrastructure charge is found in the second paragraph of Minn. Stat. § 462.358, subd. 2a. This paragraph provides two ways for a city to conditionally approve a subdivision application:
The regulations may permit the municipality to condition its approval on the construction and installation of sewers, streets ... and similar utilities and improvements or, in lieu thereof, on the receipt by the municipality of a cash deposit, certified check, irrevocable letter of credit, bond, or other financial security in an amount and with surety and conditions sufficient to assure the municipality that the utilities and improvements will be constructed or installed according to the specifications of the municipality.
Id. In other words, a city can condition approval of a subdivision application on the developer (a) constructing or installing the improvements or (b) providing a form of "financial security" that is sufficient to assure the city that the "improvements will be constructed or installed according to the specifications" of the city. Id. The statute allows cities to choose either option.
According to Woodbury, the infrastructure charge is either a "cash deposit" or "other financial security" for purposes of *547 Minn. Stat. § 462.358, subd. 2a. Woodbury contends that the infrastructure charge is a "deposit" under the definition discussed by the court of appeals: " 'money or other property' given 'to another who promises to preserve it or to use it and return it in kind.' " Harstad , 902 N.W.2d at 73 (citation omitted). Woodbury argues that the infrastructure charge is "returned in kind" when it uses "the funds to build infrastructure made necessary by development." We disagree.
The forms of "financial security" that are listed in the statute are all contemporary security measures that protect a city's interest in covering the costs of completing the infrastructure or improvement in the event that a developer fails to finish a project. The forms of financial security in this provision are inconsistent with a cash payment because they are intended to be returned or released, unless the developer fails to satisfy the conditions of the contract concerning infrastructure improvements.
The fourth paragraph of subdivision 2a supports this interpretation. It states, in relevant part:
When the applicant vouches, by certified letter to the municipality, that the conditions required by the municipality for approval under this subdivision have been satisfied, the municipality has 30 days to release and return to the applicant any and all financial securities tied to the requirements.
Id. If the developer's subdivision application is approved on the condition that the developer will build the agreed-upon infrastructure or improvement and the developer does not do so, then the city may rely on the security to ensure that the required infrastructure improvements are funded and completed. But if the developer completes the project and satisfies the condition, then the city must return or release any financial security provided. Although the Legislature has not limited the form of "financial security" to include only bonds, the mechanism created by the Legislature in this provision functions similarly to a "subdivision bond" or a performance bond that is used to insure installation of improvements. See 4 Law of Distressed Real Estate § 41:11 (Baxter Dunaway ed., 2018) (discussing "[s]ubdivision bonds," which run "to the municipality as obligee ... in an amount of money thought to be sufficient to cover the cost of improvements ... and is conditioned upon completion of those improvements"); 4 Patricia E. Salkin, American Law of Zoning § 31:49 (5th ed. 2017) (describing a specific form of performance bond used "to insure installation of improvements" and to protect cities "against failure on the part of the developer to complete required improvements").
The language used in subdivision 2b of section 462.358 also supports this interpretation because subdivision 2b expressly refers to a "cash fee" and not "financial security." See Minn. Stat. § 462.358, subd. 2b(c). This provision in subdivision 2b allows a city to require subdivision applicants to "dedicate[ ]" or preserve a portion of the subdivision "for public use as streets, roads, sewers," among other uses. Id ., subd. 2b(a). In contrast to the references to "financial security" in subdivision 2a, subdivision 2b authorizes the city to "choose to accept a cash fee" or "[c]ash payments" from the applicant instead of requiring them to dedicate a portion of the proposed development. Id. , subd. 2b(c), (f). Had the Legislature intended to authorize a city to condition subdivision approval on a "cash fee" for infrastructure improvements, it would have used those precise terms, in subdivision 2a, as it did in subdivision 2b. The Legislature did not do so. Instead, it used financial security terms *548 such as "cash deposit" and "certified check." Id. , subd. 2a.
The infrastructure charge that Woodbury seeks to impose as a condition on approval of Harstad's subdivision application is not a program designed to provide it with financial security, despite Woodbury's contrary argument. A subdivision applicant's payment of Woodbury's infrastructure charge does not provide the city with financial security because the infrastructure charge does not contemplate a return of funds by Woodbury to the applicant in the event that the applicant satisfies all the conditions tied to that security. Instead, the money goes into a city-managed fund that is used for future road-construction projects in the part of Woodbury that corresponds to the proposed development. No matter what Woodbury chooses to call this obligation, payment under Woodbury's infrastructure charge is a charge or fee. Any funds received by Woodbury under the infrastructure charge are thus not a form of financial security.
In sum, the portion of Minn. Stat. § 462.358, subd. 2a, referencing financial security does not authorize Woodbury to impose the charge at issue here. Although this provision, in the second paragraph of Minn. Stat. § 462.358, subd. 2a, does not explicitly authorize an infrastructure charge, it does explicitly authorize a city to impose conditions on the approval of a subdivision application in some circumstances. Woodbury may condition subdivision approval on the requirement that a developer construct or install streets or other improvements or provide assurance in the form of a financial security for the construction or installation of specific, related infrastructure projects. Id. But Woodbury's infrastructure charge is not a form of financial security. We conclude that the second paragraph of Minn. Stat. § 462.358, subd. 2a, does not authorize Woodbury's infrastructure charge because it is not a form of financial security as contemplated in the statute.
B.
The second provision that Woodbury relies on[9] as authority for the infrastructure charge is the last paragraph of subdivision 2a, which discusses a third way that the city may impose conditions on the approval of a subdivision application. This paragraph states:
The regulations may permit the municipality to condition its approval on compliance with other requirements reasonably related to the provisions of the regulations and to execute development contracts embodying the terms and conditions of approval. The municipality may enforce such agreements and conditions by appropriate legal and equitable remedies.
Id. According to Woodbury and amicus League of Minnesota Cities, this paragraph is a "broad grant" of contractual authority. They contend that this paragraph allows a city "to bargain for any 'terms or conditions of approval' that are 'reasonably related to the provision of the regulations,' " and assert that the paragraph authorizes a negotiation process between cities and developers leading to a payment by the developer into a funding program like Woodbury's infrastructure charge. Under this theory, the infrastructure charge is a "voluntary payment" because it is the result of a negotiation process.
Harstad disagrees. First, he argues that the development-contract provision of subdivision 2a does not authorize a city to *549 negotiate for a provision "in the form of a fee for which it has no statutory authority." Second, he contends that the infrastructure charge is not voluntary and thus not a true negotiated term of a development contract.
We agree with Harstad. First, the attempt to characterize the infrastructure charge as a voluntary obligation fails. Although the record shows that proposed infrastructure charges have changed slightly in past discussions between Woodbury and developers applying for subdivision approval, Woodbury's willingness to negotiate the specific amount of an infrastructure charge does not transform it into a voluntary payment. Although Woodbury consistently refers to infrastructure charges as "negotiable," the record does not support any suggestion by Woodbury that a developer has the option of avoiding the infrastructure charge altogether.[10] Put another way, the pearl of great price here is approval of the subdivision agreement. A developer who fails to make a "voluntary" payment in an amount Woodbury finds acceptable faces the prospect of denial of the subdivision application. The infrastructure charge is thus a requirement and Harstad is correct that there is nothing voluntary about it.
Second, the power to enter into a development contract does not include the power to require a developer to pay an infrastructure charge. We have already concluded that the second paragraph of Minn. Stat. § 462.358, subd. 2a, does not explicitly authorize a city to condition subdivision application approval on an infrastructure charge that is not a form of financial security. The contract provision in the last paragraph of subdivision 2a cannot swallow the limits in the other paragraphs of the subdivision. See Minn. Stat. § 645.16.
Our conclusion relies on the plain meaning of "other requirements reasonably related to the provisions of the regulations." Minn. Stat. § 462.358, subd. 2a. The phrase "other requirements" refers to additional or distinct requirements that may be necessary to implement the subdivision regulations that a city may impose under this statute but that were not explicitly identified in the provision. Because we construe the law "to give effect to all its provisions," Minn. Stat. § 645.16, we do not read this final paragraph of Minn. Stat. § 462.358, subd. 2a, as authorizing a power that is not authorized in the other paragraphs. In other words, because the statute does not authorize a statutory city to condition subdivision approval on an infrastructure charge, such a condition cannot be memorialized in a contract.
We conclude that the last paragraph of Minn. Stat. § 462.358, subd. 2a, is not a broad grant of contractual authority that would allow cities to impose "other requirements" that are inserted into development contracts but that fall completely outside of the limits of the statute.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
Affirmed.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

We use "Harstad" to collectively refer to Martin Harstad, Harstad Hills Inc., and Creative Capital Holdings, LP, the three respondents in this matter. Harstad Hills is the corporation identified as the developer on the application. Creative Capital Holdings, LP, is the owner of the land of the proposed subdivision.

We use the term "infrastructure charge" to refer to Woodbury's "Major Roadway Assessment" program (MRA). Woodbury also has used the terms "proposed major roadway assessment," "major roadway cost participation," and "major roadway special assessment" to refer to the infrastructure charge.

Although Woodbury has occasionally used the term "major roadway special assessment" to refer to its infrastructure charge, it has not argued that the infrastructure charge is a special assessment covered by chapter 429 of the Minnesota Statutes.

The resolution defines "Major Roadways" as the "arterial, minor arterial and collector roadways identified in the [Woodbury] Comprehensive Plan."

The infrastructure charge is Woodbury's response to concerns about financing roadway improvements in the context of increased development. Woodbury's 2000 Comprehensive Plan notes that there would likely be a "shortfall of revenue" to pay for necessary roadway improvements between 1999 and 2035 and that Woodbury "need[ed] to identify potential future sources of funding." Specifically, Woodbury suggested "tax increment funding," "development impact fees," and "transportation user fees" as potential funding mechanisms, but it noted that "[n]ew state legislation" would be necessary before development impact fees and transportation user fees "can be used in Minnesota." In the 2030 Comprehensive Plan, published in 2010, Woodbury described potential funding sources for "future roadway related projects," including a funding mechanism that significantly resembles the infrastructure charge.

According to a Woodbury ordinance, the City Council may not approve "[a]ny proposed subdivision deemed premature for development." Woodbury, Minn., Code of Ordinances § 21-16 (2018). A subdivision may be deemed premature for development for many reasons, including "if streets to serve the proposed subdivision are not.... readily extended and funded consistent with the phasing in the comprehensive plan, the capital improvements program and any relevant city ordinances, plans and policies.... [or] if the traffic volume generated by the proposed subdivision would create a hazard to public safety and general welfare or create unacceptable levels of congestion on existing or proposed streets." Id.

Amici curiae Kottschade, National Association of Home Builders, and the Builders Association of the Twin Cities contend that the infrastructure charge is an illegal tax. Neither party raises this argument. We decline to decide this issue because we generally do not consider arguments raised for the first time on appeal and generally do not decide issues raised only by an amicus. See Hegseth v. Am. Family Mut. Ins. Grp. , 877 N.W.2d 191, 196 n.4 (Minn. 2016).

Because we conclude that Woodbury did not have the authority to condition the approval of a subdivision application on payment of its infrastructure charge, we do not address whether Minn. Stat. § 462.358, subd. 2a, applies only to the "construction and installation" of "utilities and improvements" that are located within the proposed development.

Although it is the League of Minnesota Cities' amicus brief that clarifies the argument, Woodbury confirmed at oral argument that it was making this argument.

Woodbury suggests that the infrastructure charge is not required. But the record does not support this claim. When asked whether a developer is "required, in the City of Woodbury, to pay a Major Roadway Assessment fee," Woodbury's senior planner admitted that "financial participation has been required to provide the necessary roadway infrastructure needed to support the subdivision of properties within our phase 2 area." (Emphasis added.) Harstad's development is in Woodbury's "phase 2." It is undisputed that what is negotiable about the infrastructure charge is the specific amount of the charge, not the charge itself. However Harstad's obligation to Woodbury is characterized, it is not voluntary.