*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0360**

Deborah Jane Clapp,
Appellant,

vs.

Rochelle Cox, in her official capacity as
Interim Superintendent of Minneapolis Public Schools, et al.,
Respondents.

**Filed December 4, 2023
Reversed
Gaïtas, Judge**

Hennepin County District Court
File No. 27-CV-22-12454

Daniel N. Rosen, Rosen LLC, Minneapolis, Minnesota; and

Michael Bekesha (pro hac vice), Judicial Watch, Inc., Washington, District of Columbia
(for appellant)

Margaret A. Skelton, Timothy A. Sullivan, Ratwik, Roszak & Maloney, P.A., St. Paul,
Minnesota (for respondents)

Considered and decided by Gaïtas, Presiding Judge; Slieter, Judge; and Frisch,
Judge.

**NONPRECEDENTIAL OPINION**

**GAÏTAS**, Judge

Appellant Deborah Jane Clapp, a homeowner and taxpayer in Minneapolis, appeals

the dismissal of her declaratory-judgment action, which challenged the constitutionality of

a collective-bargaining agreement between Minneapolis Public Schools and its teachers'

union.  The district court concluded that Clapp's complaint failed to establish her standing to sue as a taxpayer and that the claims were not ripe.  Because Clapp's complaint pleaded an adequate basis for taxpayer standing, and the claims are ripe, we reverse the district court's dismissal of the action.

## FACTS[1]

Clapp is a Minneapolis homeowner who pays annual property taxes on her residence.  Those property taxes contribute to the funding of Minneapolis Public Schools.

Respondents are Minneapolis Public Schools, Special School District No. 1 (the school district), the Minneapolis Board of Education, and Rochelle Cox, who is the Interim Superintendent of Minneapolis Public Schools.  We refer to respondents collectively as MPS.

In August 2022, Clapp filed a complaint against MPS seeking declaratory and injunctive relief.  Clapp's complaint sought to enjoin MPS from spending money to implement and enforce a March 2022 collective-bargaining agreement that MPS and the teachers' union entered into following a three-week teachers' strike.  According to Clapp's complaint, one provision of that agreement—Article 15, which addresses the transfer,

---

[1] In this appeal from the district court's order dismissing Clapp's complaint under Minnesota Rule of Civil Procedure 12.02, our review is limited to the facts alleged in Clapp's complaint, and we must accept those facts as true.  *See Hansen v. U. S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 325 (Minn. 2019) (noting that, in reviewing a district court's ruling on a motion to dismiss under rule 12.02, the appellate court "look[s] only to the facts alleged in the complaint, accepting those facts as true").  Correspondingly, our discussion of the facts underlying the appeal is limited to the allegations in Clapp's complaint.

reassignment, and recall of teachers—violates the Minnesota Constitution's equal-protection guarantee.

Clapp's complaint states that, before the adoption of Article 15, "teachers were laid off or reassigned in order of seniority . . . , without regard to race or ethnicity." Teachers were also "reinstated in order of seniority, with the more senior teachers reinstated first, without regard to race or ethnicity." But the complaint alleges that Article 15 of the March 2022 agreement altered this practice, such that "teachers of color are exempt from [the] seniority-based layoffs and reassignments, which means, when layoffs or reassignments occur, the next senior teacher who is not 'of color' would be laid off or reassigned." Article 15 states:[2]

> Starting with the Spring 2023 Budget Tie-Out Cycle, if excessing[3] a teacher who is a member of a population underrepresented among licensed teachers in the site, the [school district] shall excess the next least senior teacher, who

---

[2] Typically, if "matters outside the pleading are presented to and not excluded by the court, the motion [to dismiss] shall be treated as one for summary judgment and disposed of as provided in Rule 56." Minn. R. Civ. P. 12.02. Clapp did not attach the March 2022 agreement to her complaint. However, MPS submitted the agreement, including Article 15, to the district court with its motion to dismiss. And if a complaint contains a contract-based claim, "the court may consider the entire written contract when the complaint refers to the contract and the contract is central to the claims alleged." *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 180 (Minn. App. 2012) (quotation omitted), *rev. denied* (Minn. Apr. 25, 2012); *see also Hous. & Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005) (noting that appellate courts interpret and enforce a collective-bargaining agreement under contract principles). Because the March 2022 agreement is central to Clapp's claims, we may review it without converting the motion to dismiss into a summary-judgment motion.

[3] As defined by Article 15, "[e]xcessed status exists when there is a reduction in staffing at a school or site." The "process of excessing is a separate process from layoff."

3

is not a member of an underrepresented population, for the reasons provided in Article 15.1.2.i.

. . . .

Reinstatement must be in the inverse order of placement on lay off. The [school district] shall prioritize the recall of a teacher who is a member of a population underrepresented among licensed teachers in the [school district], per the definition provided in Article 15.1.2.i. To do this, the [school district] shall deprioritize the more senior teacher, who is not a member of an underrepresented population, in order to recall a teacher who is a member of an underrepresented population among licensed teachers, for the reasons provided in Article 15.1.2.i.

Article 15.1.2.i provides that the anticipated outcome of the policy is to:

remedy the continuing effects of past discrimination by the [school district]. Past discrimination by the [school district] disproportionately impacted the hiring of underrepresented teachers in the [school district], as compared to the relevant labor market and the community, and resulted in a lack of diversity of teachers. Language which refers to this Article will no longer be in effect once the teachers in the [school district] reflect the diversity of the labor market and the community served by the [school district].

The complaint alleges that MPS will lay off or reassign approximately 220 teachers between 2022 and 2027.

According to Clapp's complaint, Article 15 violates equal protection under the state constitution because it "provides preferences, protections, and privileges for MPS teachers of certain races and ethnicities" for layoffs and recalls. The complaint further asserts that Article 15 requires MPS to spend public money to implement this allegedly unlawful practice.

4

Clapp's complaint alleges that the district court has jurisdiction to consider her challenge to Article 15 under Minnesota's common-law taxpayer-standing doctrine. The complaint states that approximately 31% of MPS's costs are funded by local property taxes, these costs include "programs, services, and other expenses, including expenses associated with the process of laying off, reassigning, reinstating, and retaining teachers," and MPS will rely on public funding "to implement the contract, including laying off, reinstating, and retaining teachers in accordance with Article 15."

MPS moved the district court to dismiss the complaint under rule 12.02 of the Minnesota Rules of Civil Procedure, arguing that (1) Clapp lacks standing to challenge the agreement, (2) the complaint fails for lack of ripeness, and (3) Clapp has not stated a claim on which relief may be granted. Following a hearing, the district court granted MPS's dismissal motion, determining that Clapp lacked standing and her claims were not ripe. The district court did not address MPS's third argument—that Clapp failed to state a claim on which relief could be granted.

Clapp appeals.

## DECISION

### I. The district court erred by dismissing the complaint for lack of standing.

Clapp first argues that the district court erred by determining that her complaint failed to establish her standing as a taxpayer to challenge Article 15 of the agreement between MPS and the teachers' union. "Standing is a legal requirement that a party have a sufficient stake in a justiciable controversy to seek relief from a court." *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 338 (Minn. 2011) (quotation omitted). Simply stated,

standing concerns "whether the plaintiff is the proper party to bring a particular lawsuit." *Citizens for Rule of Law v. Senate Comm. on Rules & Admin.*, 770 N.W.2d 169, 174 (Minn. App. 2009) (quotation omitted), *rev. denied* (Minn. Oct. 20, 2009). Generally, a party has standing to bring a lawsuit for one of two reasons: either the party has suffered an injury-in-fact, or the party has a statutory right to sue. *Nash v. Wollan*, 656 N.W.2d 585, 588 (Minn. App. 2003), *rev. denied* (Minn. Apr. 29, 2003). "The lack of standing bars judicial consideration of a claim." *Scheffler v. City of Anoka*, 890 N.W.2d 437, 451 (Minn. App. 2017), *rev. denied* (Minn. Apr. 26, 2017). In other words, standing is jurisdictional. *Richards v. Reiter*, 796 N.W.2d 509, 512 (Minn. 2011).

Clapp does not assert that she has an injury-in-fact or statutory standing. Instead, she relies on another source of standing, Minnesota's common-law taxpayer-standing doctrine. Under this doctrine, which is rooted in caselaw, a taxpayer has standing to "maintain an action that restrains the unlawful disbursements of public money or illegal action on the part of public officials." *Olson v. State*, 742 N.W.2d 681, 684 (Minn. App. 2007) (quotation omitted). In 1928, the Minnesota Supreme Court observed in *Oehler v. City of St. Paul* that, "it is well settled that a taxpayer may, when the situation warrants, maintain an action to restrain unlawful disbursements of public moneys . . . [and] restrain illegal action on the part of public officials." 219 N.W. 760, 763 (Minn. 1928) (addressing the legal capacity of taxpayers to sue to prevent an individual from holding a civil service position). Several years later, in *Regan v. Babcock*, the supreme court reiterated that taxpayers "have a substantial interest in the honest expenditure of the funds into which their taxes are paid." 247 N.W. 12, 16 (Minn. 1933) (determining that plaintiffs, as

6

taxpayers who paid auto-license fees and state-gas taxes, had a sufficient interest to maintain a suit to stop payment of funds on highway construction contracts); *see also Arens v. Village of Rogers*, 61 N.W.2d 508, 514 (Minn. 1953) (noting that "[t]axpayers have a real and definite interest in preventing an illegal expenditure of tax money by a municipality").

But taxpayer standing is limited, and "[t]axpayers generally lack standing to challenge government action absent damage or injury which is special or peculiar and different from damage or injury sustained by the general public." *Citizens for Rule of Law*, 770 N.W.2d at 174 (quoting *Olson*, 742 N.W.2d at 684). "[T]he line is drawn where a taxpayer seeks to challenge what the taxpayer perceives to be an illegal expenditure or waste of tax monies." *Olson*, 742 N.W.2d at 684-85. A taxpayer "without a personal or direct injury may still have standing but only to maintain an action that restrains the unlawful disbursements of public money or illegal action on the part of public officials." *Id.* at 684 (quotation omitted). However, "[s]imple 'disagreement with policy or the exercise of discretion by those responsible for executing the law' does not supply the 'unlawful disbursements' or 'illegal action' of public funds required for standing to support a taxpayer challenge." *Id.* at 685 (quoting *Rukavina v. Pawlenty*, 684 N.W.2d 525, 531 (Minn. App. 2004), *rev. denied* (Minn. Oct. 19, 2004)). Rather, the party asserting taxpayer standing must identify an unlawful "expenditure made as a result of the challenged [rules]." *Id.* (holding that challenge to tax exemption could not be pursued solely on taxpayer basis because it did not involve expenditure of tax funds).

The question we must address is whether the allegations in Clapp's complaint concerning her standing as a taxpayer were sufficient to survive MPS's motion to dismiss. A district court may dismiss a civil action for lack of standing. Minn. R. Civ. P. 12.02(a) (stating that a district court may dismiss a complaint for lack of jurisdiction); *Garcia-Mendoza v. 2003 Chevy Tahoe*, 852 N.W.2d 659, 663 (Minn. 2014) (stating that lack of standing bars judicial consideration of claims). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Forslund v. State*, 924 N.W.2d 25, 32 (Minn. App. 2019) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (quotation omitted)). "[C]ourts are to construe pleadings liberally." *Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 535 (Minn. 2003). The reviewing court reviews de novo a district court's determination regarding a party's standing to sue. *In re Gillette Child.'s Specialty Healthcare*, 883 N.W.2d 778, 784 (Minn. 2016).

The district court determined that the allegations in Clapp's complaint failed to establish her standing as a taxpayer because "parts of Article 15 can be carried out without illegally discriminating on the basis of race or ethnicity" and "Article 15 requires prioritizing members of underrepresented populations in only a handful of specific instances." According to the district court, because "it is not clear that consideration of a

8

teacher's membership within an underrepresented group necessarily requires consideration of race and ethnicity," Clapp's assertion that "money is and will be spent implementing, furthering, and ensuring compliance with Article 15 is not a specific allegation that" MPS has "expended public funds for an unlawful purpose or [is] about to do so." (Quoting *Borom v. City of St. Paul*, 597 N.W.2d 595, 596 (Minn. 1971).) Thus, the district court stated, "Clapp cannot establish taxpayer standing without pleadings that are more specific."

We disagree with the district court's reasoning, which seems to require that a taxpayer prove at the pleading stage that the taxpayer's funds will necessarily be used for the unlawful purpose alleged. Given the procedural posture of this case and the corresponding law, which requires us to accept all of Clapp's allegations as true and view them in Clapp's favor, we conclude that the complaint alleged sufficient facts to support the existence of taxpayer standing. The complaint alleges that Clapp pays property taxes in Minneapolis, such local taxes fund 31% of MPS's costs, MPS's costs include "expenses associated with the process of laying off, reassigning, reinstating, and retaining teachers," and MPS will rely on taxpayer funding to implement the collective-bargaining agreement, "including laying off, reassigning, reinstating, and retaining teachers in accordance with Article 15." Further, the complaint asserts that, by following the procedures in Article 15 for layoffs and recalls, MPS will violate equal-protection guarantees under the state constitution because those procedures "provide[] preferences, protections, and privileges for MPS teachers of certain races and ethnicities." These assertions—although general— identify an allegedly unlawful expenditure of Clapp's taxpayer funds. Accordingly, the assertions are adequate to show the existence of taxpayer standing.

9

Defending the district court's dismissal of Clapp's complaint, MPS points out that more recent caselaw has narrowed the doctrine of taxpayer standing. *See Schroeder v. Minn. Sec'y of State Steve Simon*, 950 N.W.2d 70, 78 (Minn. App. 2020) (observing that the Minnesota Supreme Court's decision in *McKee v. Likins*, 261 N.W.2d 566 (Minn. 1977), which is frequently interpreted to suggest that taxpayer standing is broadly available, has been limited closely to its facts), *petition for rev. dismissed* (Minn. Nov. 25, 2020). *But see Save Lake Calhoun v. Strommen*, 928 N.W.2d 377, 384 (Minn. App. 2019) (determining that taxpayer had standing to proceed based on *McKee*), *aff'd in part, rev'd in part on other grounds*, 943 N.W.2d 171 (Minn. 2020). MPS notes that the caselaw makes clear that to invoke taxpayer standing a plaintiff must identify "a specific disbursement" that is unlawful. *See Schroeder*, 950 N.W.2d at 78 (citing *Citizens*, 770 N.W.2d at 175) (stating that the taxpayer-standing doctrine is limited to challenges that allege "a specific disbursement" of public money). And MPS contends that Clapp has not alleged the existence of a specific disbursement of public funds that distinguishes her injuries as a taxpayer from those sustained by the general public. Instead, according to MPS, Clapp's complaint merely speculates that implementing Article 15 will require MPS to expend taxpayer funds.

We recognize that the taxpayer-standing doctrine is limited, and that a plaintiff relying on the doctrine must challenge a specific disbursement. *See id.* However, Clapp's complaint *does* allege that a specific disbursement of Clapp's taxpayer funds will be used for an unlawful purpose. The complaint alleges that MPS receives 31% of its funding from taxpayers, and that those funds will be used to lay off, reassign, reinstate, and retain

10

teachers in accordance with Article 15. These allegations are adequate—*at the pleading stage*—to satisfy the requirement for a challenge to a specific disbursement of funds.

MPS also argues that Clapp's complaint fails because it did not allege that additional new funds—above and beyond the funds currently used to lay off, reassign, reinstate, and retain teachers—would be required to implement Article 15. However, Clapp's general allegation that implementing Article 15 will require public funds was sufficient. We also note that, although MPS submitted two exhibits in support of its motion to dismiss,[4] it failed to put forth specific evidence refuting Clapp's assertion regarding the expenditure of funds. *See Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321, 334 (Minn. 2016) (stating that a plaintiff cannot rely on a general allegation of personal jurisdiction in a complaint when a defendant's motion to dismiss is supported by specific evidence, such as an affidavit, that refutes that general allegation). MPS could have refuted Clapp's general assertion regarding the disbursement of funds to implement Article 15. But MPS did not provide any evidence to support the assertion that it makes now—that no new public money will be required to lay off, reassign, reinstate, and retain teachers pursuant to Article 15.[5]

---

[4] As exhibits in support of its motion to dismiss, MPS submitted the official minutes of the meeting where the collective-bargaining agreement was ratified and the collective-bargaining agreement itself.

[5] We likewise reject MPS's repeated assertion that Clapp did not "plausibly" allege taxpayer standing. The Minnesota Supreme Court has explicitly rejected the "plausibility standard" articulated in federal courts. *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 603 (Minn. 2014) ("[W]e now decline to engraft the plausibility standard from [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),] and [*Ashcroft v. Iqbal*, 556 U.S. 662 (2009),] onto our traditional interpretation of Minn. R. Civ. P. 8.01.").

11

At this stage in the proceedings, when we must accept the allegations in the complaint as true and construe them in favor of Clapp as the complaining party, we conclude that the complaint was sufficient to show the existence of taxpayer standing. Accordingly, we reverse the district court's dismissal of the complaint on the ground that Clapp lacked standing to pursue her claims.[6]

## II. The district court erred by dismissing the complaint on the ground of ripeness.

Clapp next challenges the district court's decision to dismiss her lawsuit as unripe. The ripeness doctrine governs when a plaintiff may bring a claim. *McCaughtry*, 808 N.W.2d at 338. Under the ripeness doctrine, a plaintiff cannot bring a lawsuit "before a redressable injury exists." *State by Friends of Riverfront v. City of Minneapolis*, 751 N.W.2d 586, 592 (Minn. App. 2008), *rev. denied* (Minn. Sept. 23, 2008); *see also Lee v. Delmont*, 36 N.W.2d 530, 537 (Minn. 1949) (noting that a party who challenges a law must show that it "is, or is about to be, applied to [the complaining party's] disadvantage"). A complaining party must "show a direct and imminent injury." *McCaughtry*, 808 N.W.2d at 337 (quotation omitted) (cautioning that courts do not issue advisory opinions); *see also Lee*, 36 N.W.2d at 537 (requiring an actual or imminent injury). Issues involving only

---

[6] MPS also argues that the complaint must be dismissed for failure to state a claim on which relief could be granted because (1) there is no recognized cause of action called "taxpayer action" and (2) there is no private cause of action to enforce the Minnesota Constitution. The district court did not address these arguments. And given our decision here, we do not address them either. *See Goeb v. Tharaldson*, 615 N.W.2d 800, 815 n.9 (Minn. 2000) ("Because the other issues raised are dispositive of this matter, we do not address [an alternative] argument.").

12

hypothetical possibilities are not justiciable because "[n]either the ripe nor the ripening seeds of a controversy are present." *Lee*, 36 N.W.2d at 537.

Ripeness raises a question of justiciability, which we review de novo. *Dean v. City of Winona*, 868 N.W.2d 1, 4 (Minn. 2015); *see also In re Civ. Commitment of Nielsen*, 863 N.W.2d 399, 401 (Minn. App. 2015) (characterizing ripeness as "a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies"), *rev. denied* (Minn. Apr. 14, 2015). There is no mechanical test to determine whether a justiciable controversy exists, and courts must consider the specific facts of each case. *Holiday Acres No. 3 v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis*, 271 N.W.2d 445, 447-48 (Minn. 1978).

Clapp's action sought declaratory judgment. Notwithstanding the ripeness doctrine, the Uniform Declaratory Judgments Act provides courts with the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Minn. Stat. § 555.01 (2022). Minnesota courts recognize "the 'preventative' purpose of declaratory judgment actions." *McCaughtry*, 808 N.W.2d at 339 (quoting *Petition for Improvement of Cnty. Ditch No. 86 v. Phillips*, 625 N.W.2d 813, 821 (Minn. 2001)). Such actions "allow parties to be relieved of an uncertainty and insecurity arising out of an actual controversy about their legal rights before those rights actually have been invaded." *Harstad v. City of Woodbury*, 902 N.W.2d 64, 71 (Minn. App. 2017) (quotations omitted), *aff'd*, 916 N.W.2d 540 (Minn. 2018).

13

The district court dismissed Clapp's claims for declaratory judgment as unripe. It reasoned that:

> In the absence of perpetrated or imminent discrimination on the basis of race or ethnicity pursuant to Article 15, the Court would be forced to determine the presence of an injury based on calculations involving hypothetical disbursements, hypothetical overall costs, and hypothetical overall savings. Whether Clapp has suffered or will imminently suffer an injury as a taxpayer cannot be determined without perpetrated or imminent illegal discrimination on the basis of race or ethnicity, otherwise the Court will be forced to deal with a hypothetical and therefore nonjusticiable issue.

We disagree with the district court's analysis. In the context of a declaratory-judgment action, an actual controversy that is likely to occur in the future is justiciable. For example, we concluded in *Harstad* that a property owner's declaratory-judgment claims regarding a disputed road assessment was ripe. *Id.* Because there was both an actual controversy and no uncertainty about whether the city would impose the assessment, we determined that the claims were justiciable even though the city had yet to impose the assessment. *Id*. at 70-71. And we noted that "[w]e have found similar legal questions to be ripe in situations where the status quo has not been altered." *Id*. at 71 (citing *Minneapolis Fed'n of Men Teachers, Local 238, AFL v. Bd. of Educ. of Minneapolis*, 56 N.W.2d 203, 205-06 (Minn. 1952)). Likewise, in *Minneapolis Fed'n of Men Teachers*, the Minnesota Supreme Court concluded that the plaintiffs' claims for declaratory judgment were ripe when the board of education had adopted, but not yet implemented, a resolution requiring tenured teachers to sign a written contract for the following school year. 56 N.W.2d at 204-05. Rejecting the board's ripeness challenge, the supreme court determined

14

that there was "little doubt" that a justiciable controversy existed, and therefore, "jurisdiction exists although the [s]tatus quo . . . has not yet been destroyed or impaired and even though no relief is or can be claimed or afforded beyond that of merely declaring the complainant's rights so as to relieve him from a present uncertainty and insecurity." *Id*. at 205-06.

Here, Clapp's claims for declaratory judgment concerned an actual controversy. Clapp sought to enjoin MPS from using public money to implement a provision of the collective-bargaining agreement that Clapp alleges bases certain employment decisions on the race and ethnicity of the teachers in violation of the Minnesota Constitution. According to the complaint, the agreement requires MPS to

> undertake a comprehensive process, which includes identifying all teachers employed at the school where the layoffs or reassignments are to occur; identifying positions to which teachers may be reassigned; several rounds of employment interviews for those reassigned positions; reference checks of teachers to be reassigned; and an appeal process, which includes mediation.

Clapp contends that each step in this process will require public funding. And the complaint asserts that MPS will lay off or reassign approximately 220 teachers between 2022 and 2027.

Because Clapp's complaint alleges an actual future controversy in the context of a declaratory-judgment action, her claims are ripe. We therefore reverse the district court's dismissal of the complaint on the ground that Clapp's claims are not ripe.

15

## III. We do not reach the parties' constitutional arguments.

MPS asserts that Clapp failed to state a claim on which relief can be granted because the language in Article 15 is facially constitutional. Clapp responds that Article 15 is unconstitutional because it cannot survive strict scrutiny. MPS raised this issue in its dismissal motion to the district court, but the district court did not address it. We decline to address this issue in the first instance. *See Monson v. Suck*, 855 N.W.2d 323, 329 (Minn. App. 2014) (declining to address an alternative argument in the first instance that was presented to but not decided by the district court), *rev. denied* (Minn. Dec. 30, 2014); *Slindee v. Fritch Invs., LLC*, 760 N.W.2d 903, 911 (Minn. App. 2009) (same).

**Reversed.**